[No. H000328. Sixth Dist. July 29, 1986.]

ROBERT ROBINSON, Plaintiff and Appellant, v.
HEWLETT-PACKARD CORPORATION, Defendant and Respondent.

1110

**COUNSEL**

Alfred P. Chasuk, Glynn P. Falcon and Chasuk, Falcon & Chasuk for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Dennis A. Gladwell, Christopher J. Martin and Susan M. Byrd for Defendant and Respondent.

**OPINION**

**BRAUER, J.**—Robert Robinson appeals from a summary judgment entered in favor of respondent Hewlett-Packard Corporation (hereinafter designated HP). On appeal Robinson advances a variety of arguments, all devoted essentially to the proposition that the trial court abused its discretion in granting summary judgment. For reasons hereinafter set forth, we affirm in part and reverse in part.

## I. BASIC BACKGROUND

On May 1, 1978 HP hired Robinson as a janitor, at a salary of $725 per month. He voluntarily left that position on July 10, 1978. On November 5, 1979, HP rehired Robinson as a janitor, at a salary of $800 per month. Robinson again left the position, apparently voluntarily, on February 19, 1980. On the latter date his then supervisor wrote a comment describing Robinson as "an excellent worker," and expressing the opinion that "he should be eligible for rehire."

On September 2, 1980, HP again rehired Robinson, this time as a general maintenance serviceman, at a salary of $900 per month. He was assigned to a plating department, where he worked the graveyard shift. After three months his supervisor, Ronald Hadanak, noted in a performance evaluation (1) that Robinson's initiative, dependability, and work quantity were all "very good"; (2) that his work quality, teamwork, and judgment were all "good"; and (3) that Robinson "has thus far done a very good job." Robinson continued working in the plating department thereafter, and he was assigned a wider variety of tasks. On May 1, 1981, his pay rate was increased to $1,000 per month.

During the third week of June in 1981, Robinson sustained an injury to his lower back while working in the plating department. Ultimately the Worker's Compensation Appeals Board determined that this injury caused Robinson permanent partial disability of 13.75 percent,[1] after adjustment for age and occupation. Nevertheless Robinson continued to work in the plating department. In a performance evaluation dated July 21, 1981, Hadanak (1) rated Robinson's judgment "very good" and his work quality,

---

[1] Following the injury HP paid temporary disability benefits and supplied medical treatment. Robinson's claim for compensation was not filed until January of 1983, and the Worker's Compensation Appeals Board did not make an award until May 25, 1983. By that time Robinson's employment at HP had terminated.

In connection with his worker's compensation claim, Robinson obtained through discovery a document alluding to HP's employment of a "subrosa investigator" to follow him around. We discuss that document in Part V of this opinion, *post.*

work quantity, initiative, teamwork, and dependability all "good"; and (2) wrote that "Robert's overall performance is good." Hadanak also noted that Robinson was "considering the possibility of transferring to another area of the Division or Company more suited to him."

On September 17, 1981, Robinson transferred to one of HP's product assembly departments. There he was involved in "cable cutting, stripping, soldering wires to connectors, labeling and bagging as well as operating machinery such as Tin Canning, Jack Screwing and Sonic Welder," plus "Electronic Testing of products, Inspection, Training of personnel, Quality Controlling and Housecleaning." He worked the swing shift, and his new supervisor was Michael Christmon. One of Robinson's assignments was that of "Pushbutton Switch inspection." After ten months Christmon wrote a performance evaluation (dated May 28, 1982) in which he concluded that "Robert is a good performer overall." Christmon said that "[t]he quality of work produced by Robert over the last 10 months was consistently at a very good level. Robert takes pride in the quality of the work that he is producing and his workmanship was well demonstrated by the inspection of the pushbutton switches and the HPIB Cable Assembly process." As to the quantity of work, Christmon wrote that "[t]he output of products produced by Robert is at a good average overall. . . . Pushbutton Switch Inspection and Jack Screwing were just under standard on occasions. . . . In Pushbutton Switch inspection he did 7.18 tubes per hour Vs. 8.0 standard."[2] On the topic of "dependability," Christmon wrote: "Robert had the misfortune of an accident before he transferred to Product Assembly. His dependability has suffered due to 168 hours on sick leave and 96 hrs. on IPP in the past 10 months. This high lost time has cast a shadow on Robert's ability to be rated higher over the past 5 months and has caused difficulty in scheduling assignments and meeting production targets." In a summary, Christmon concluded: "His dependability was hurt badly due to high Lost Time on sick leave and I.P.P.; But when Robert was at work he could be counted on to follow assignment and do his share of the workload." Well before Christmon wrote his evaluation, Robinson's salary was increased to $1,100 per month.

Then on June 1, 1982, Robinson transferred to the day shift of the product assembly line. There his sole function was that of pushbutton switch in-

---

[2]In an excerpt from a deposition produced in opposition to HP's motion for summary judgment, Giovanna ("Jo") Rosso testified that pushbutton switch inspection involved "[p]utting them in small tubes of twenty" for packaging and shipping. Eight "small tubes of twenty" inspected pushbutton switches comes to 160 switches per hour, or 1,280 switches per eight-hour day. If Robinson was producing "7.18 tubes per hour," he was turning out 143.6 inspected switches per hour, and 1,148.8 switches per eight-hour day.

On the other hand, Michael Cowan, personnel manager of HP, said in a declaration that the "[s]tandard rate of production was set at 1,333 switches per eight-hour day; average rate of production for the department was 1,600 switches per eight-hour day."

spector. The only evidence[3] in the record which sheds any light on the reason for the change of shift and the abridgement of Robinson's duties is a sentence written by Peter Mosely of HP's personnel department. That sentence reads: "I pointed out to Robbie several times during the conversation that, given his injury, it had been our decision to give him the lightest possible work that we could find in the organization, and he acknowledged that there was nothing lighter than our switches to work on; but, then countered that the sitting was a problem."[4]

On the day shift Robinson encountered a different supervisor, Giovanna ("Jo") Rosso. According to Robinson, Rosso made contumelious remarks to him, saying (1) that she did not like Blacks; (2) that Black people in general do not like to work, they try to get something for nothing; (3) that Robinson himself, being Black, did not want to work; and (4) that Robinson was "faking it," i.e., magnifying the true measure of his back injury.[5] Under Rosso's supervision, Robinson inspected an average of 800 pushbutton switches per day, at a time when HP's "standard" rate was 1,333 switches per day. Robinson also rejected far too many acceptable switches.[6]

On October 22, 1982, Rosso presented Robinson with a typewritten "Performance Warning," which in essence told Robinson (1) that his rate of inspection was substandard, and (2) that he was rejecting too many acceptable pushbutton switches. Rosso herself signed the warning, as did

---

[3]As distinguished from argument.

[4]Mosely made typewritten notes of a conversation he had with Robinson on December 3, 1982. Robinson obtained those notes through discovery in the worker's compensation proceedings, and presented them to the trial court as an exhibit in opposition to HP's motion for summary judgment.

[5]In a deposition taken in connection with the worker's compensation proceedings, Rosso plainly expressed scepticism about Robinson's back injury. Rosso testified as follows:

"Q: As his supervisor, do you attribute any of the problems that he is having, or apparently having, in meeting the inspection quotas to his back condition or back problem?

"A: Well, he was doing eight hundred before, right?

"Q: I will take your word for it.

"A: It's right there. He is not doing it any more. If he was hurting before, he is hurting now, how come he was doing eight hundred before and he cannot do it now?

"Q: And your answer to that question that you have posed is what?

"A: I don't know. I am asking. If he was hurting before and he was doing eight hundred, he probably was hurting just as much as now."

In the same deposition Rosso testified that Robinson's job as pushbutton switch inspector required only the use of two fingers, and that "I think that two fingers has nothing to do with the back."

These excerpts from Rosso's deposition were presented to the trial court in opposition to HP's motion for summary judgment.

[6]In the worker's compensation proceedings, Robinson attributed his poor performance to the fact that he had to sit for long periods of time, and the sitting made his back pain agonizing. But according to Mosely's notes (see fn. 4, *ante*), HP provided Robinson "with an opportunity to stand or sit at his convenience throughout the day."

Tom Offutt, the section manager; but Robinson refused to sign. The warning told Robinson to increase his output of inspected switches to a rate of 1,440 per day, and concluded with an admonition that "[f]ailure to comply with these corrective actions will lead to probation."

On November 11, 1982, Rosso and Bart McMurray (another supervisor) approached Robinson with a view toward instructing him in the proper method of handling pushbutton switches. Robinson immediately adopted a defensive stance, accused the supervisor of "being after him," and shouted that "he didn't want to hear any of that 'B.S.'" The outburst disrupted the product assembly department, and the supervisors retired in disarray. Later in the day Robinson did a reprise with McMurray in the plastic molding department. Once again, the outburst caused disruption. In the afternoon Robinson calmed down, and McMurray showed Robinson "the handling procedures necessary not to bend west switch contacts." McMurray also told Robinson "that refusal to listen to a supervisor's feed-back was an unacceptable work habit."

Thereafter Robinson's inspection rate steadily decreased from 800 switches per day to an average of 464 switches per day. On December 1, 1982, Rosso gave Robinson a typewritten "Notice of Probation," which (1) told Robinson that he was placed on probation for 60 days; (2) directed him to increase his inspection output to a rate of 1,440 switches per day; (3) directed him to reduce the number of rejected switches; (4) said "[f]ailure to meet the above conditions or to achieve an overall acceptable level of performance will result in your termination as an employee of Hewlett-Packard"; and (5) concluded with the admonition that "[a]ny slip back to a previous unacceptable performance level or unacceptable pattern of conduct will be grounds for immediate termination." The notice was signed by Rosso and by Tom Offutt, the section manager; but once again, Robinson refused to sign.

Evidently the notice of probation had no effect.[7] According to notes made by Peter Mosely of HP's personnel department, on Wednesday, December

---

[7]Between December 1, 1982, and January 24, 1983, Robinson became convinced that someone was sabotaging his work. Peter Mosely, of HP's personnel department, had a conversation with Robinson on December 3, 1982. Afterward, Mosely noted: "[¶] He also made an accusation about people, whom he did not name or could not name, in his department who appeared to be sabotaging his work. He brought along a bag of switches and indicated that these had been tampered with, which resulted in a reduction in his quality, which is now being held against him."

The matter was not left there. HP agreed to lock Robinson's switches in a cabinet every night. According to notes made by Rosso on December 29, 1982, Robinson still was not satisfied—he felt that his work was "still not safe, because 2 other people on day shift have the lock combination." Rosso wrote further, "[t]oday I have changed the lock & only Robert and I have the combination."

14, 1982, "I responded to a request from Robbie to come and talk with him. This was at his work station. He stated that he was unable to do the work. That it was being tampered with. I discussed the flow of work with him carefully and tried to understand how it could be tampered with. I inspected some returned work, and could not see any of the gross defects he claimed were there. I formed the strong impression that he was sabotaging his own work, but did not say this to him. Ted Elms arrived on the scene. Robbie was defensive when I tried to get him to explain the process, and became hostile and told me I wasn't interested in helping him. By now, he had me angry as he was not accepting my effort to help, but rather felt I was trying to prove him wrong, and I said to him, 'I wouldn't have spent so damn much time on this if I didn't want to help.' This upset him and he accused me of swearing at him. I realized he was now making me very angry so I left the area leaving him with Ted. [¶] A few minutes later, he approached me as I was talking to Mike Cowan about the incident and asked to see us together. Ted, Mike, and I went into a conference room where he reiterated the fact that he could not do the work and could not meet the terms of the probation. We listened carefully (he stood the whole time as he stated his back hurt him). I reassured him that we did want to help, but did not see what else to do, given that we had picked the simplest and lightest work we had." Thereafter Robinson "left the room feeling it was hopeless. We were moved again by his story and went to Bill Sullivan and his sheet metal manager to see again if the job Robbie had would be appropriate. The answer was no as it involves lifting and working with the arms outstretched, and sitting for considerable periods."

On January 24, 1983, HP presented Robinson with a typewritten notice of termination of employment, signed by Rosso, Offutt, and Cowan.[8] The notice read in pertinent part: "[¶] During the probation period, I [Rosso] met with you to provide feedback on your performance and made suggestions for improvement at least once a week. Your output has on occasion, reached 630 switches a day however, your average is 533 per day which does not meet your goal of 1440 per day. You have rejected more than three times the number of switches for bent fingers than are found on average by all other inspectors in the department. . . . [¶] I have reviewed your performance behavior and overall attitude toward your job with other levels of management and the personnel department. As a result of this review, we decided to terminate your employment with Hewlett-Packard for not meeting the requirements of your probation."

The next day, January 25, 1983, Robinson attempted to file a complaint of racial discrimination with the Department of Fair Employment and Hous-

---

[8]The typewritten date on the notice was January 20, 1983, a Thursday. But the notice was actually given to Robinson in person on January 24, a Monday.

ing. The department refused to accept his complaint, but on the same date it issued him a "right to sue" letter. (See Gov. Code, § 12965, subd. (b).)

Robinson also applied for unemployment insurance benefits. Initially his claim was denied on the ground that he had been discharged for "misconduct." But on appeal to the Unemployment Insurance Appeals Board, an administrative law judge reversed the department's decision, and ruled that Robinson was entitled to benefits. In his opinion (mailed June 15, 1983) the administrative law judge said in part: "[¶] From the evidence presented at the hearing, it is found the claimant was discharged for something less than misconduct in connection with his work. He is not disqualified for benefits. It is further found, contrary to the afferent assertions, he was not discharged for racial prejudice."

Robinson filed his complaint in the present action on January 20, 1984. On the same date he also filed a petition with the Worker's Compensation Appeals Board, alleging that HP had violated the provisions of Labor Code section 132a.[9] In pertinent part the petition reads: "[¶] As a direct, contributing and proximate cause of his filing said application [i.e., his previous application for benefits] with the Workers' Compensation Appeals Board, employer Hewlett-Packard discriminated against applicant, thereby terminating applicant from his employment . . . ." At the time summary judgment in the present action was granted, Robinson's claim under Labor Code section 132a was still pending before the Worker's Compensation Appeals Board.

## II. The Complaint

Robinson's complaint in the present action was framed on Judicial Council forms. It may charitably be described as an inartful pleading. At first glance, the complaint appears to set forth four separate causes of action; but in opposition to HP's motion for summary judgment, Robinson's counsel argued no less than five legal theories which, he claimed, were all embraced within the allegations of the complaint. Summary judgment was granted in

---

[9]Labor Code section 132a reads in part as follows: "[¶] It is the declared policy of this state that there should not be discrimination against workers who are injured in the course and scope of their employment. [¶] (1) Any employer who discharges, or threatens to discharge, or in any manner discriminates against any employee because he or she has filed or made known his or her intention to file an application for adjudication with the appeals board, or because the employee has received a rating, award or settlement, is guilty of a misdemeanor and the employee's compensation shall be increased by one-half, but in no event more than ten thousand dollars ($10,000), together with costs and expenses not in excess of two hundred fifty dollars ($250). Any such employee shall also be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer."

favor of HP as to the whole complaint. We therefore begin with a review of the pleading.

The first cause of action was entitled "Breach of Contract." It was there alleged (1) that Robinson and HP had entered into an agreement which was "[p]artially written, partially oral and part implied by conduct"; (2) that HP breached the agreement by "unilaterally terminating the agreement by firing plaintiff"; and (3) that "[d]efendants, and each of them, breached the implied covenant of good faith and fair dealing towards plaintiff by wrongfully terminating his employment with defendants." The first cause of action also incorporated an "Exemplary Damages Attachment," which was pled on information and belief. The Attachment accused HP of malice, fraud, and oppression because HP, "through and by it's [sic] agents and employees, terminated plaintiff's employment agreement without cause, and motivated, in whole or in part, by racial discrimination against this black plaintiff. Plaintiff has previously exhausted his administrative remedies with DFEH and EEOC."

In the middle of the first cause of action, the following was alleged on information and belief: "Invasion of privacy. Defendant HEWLETT-PACKARD caused plaintiff to be followed in his after-work hours by a sub-rosa investigator. Said conduct invaded plaintiff's constitutional right to privacy. Plaintiff is informed and believes that defendant engaged in this conduct in an attempt to find private, confidential information regarding this plaintiff, so as to use such as a pretext for plaintiff's termination."

The second and third causes of action were both entitled "Fraud." In cause two it was alleged that HP "made representations of material fact as follows: That plaintiff would be employed so long as his performance was acceptable, or better, except for such times as plaintiff may be partially disabled. Defendants represented that it would ensure plaintiff would be treated fairly and that it would follow HEWLETT-PACKARD company policies and procedures as set forth in various printed materials prepared by defendant. [¶] b. These representations were in fact false. The truth was as follows: Plaintiff was wrongfully terminated on January 23, 1983 without good cause and without fairness and without compliance with company policies and procedures." Cause three alleged that HP "made a promise about a material matter without any intention of performing it," and then incorporated the allegations of cause two by reference.

The fourth cause of action was entitled "Intentional Tort." There it was alleged that "[d]efendants' agents and employees, and ratified by defendant HEWLETT-PACKARD CORPORATION, terminated plaintiff's employment without cause, intentionally and maliciously for the purpose of causing plaintiff

to suffer humiliation, mental anguish and mental and physical distress, and to deprive plaintiff of his earnings and well being." And then came this cryptic sentence: "Additionally, said termination is against the public policy of this state."

Here, as he did in the trial court, Robinson contends that the foregoing melange asserts a right to recover based on five legal theories, as follows:

1. Wrongful discharge, based upon a breach of an implied covenant of good faith and fair dealing.

2. Wrongful discharge, based upon racial discrimination.

3. Invasion of privacy.

4. Intentional infliction of emotional distress.

5. Wrongful discharge, in retaliation for attempting to exercise legal rights.

We discuss each of these theories in turn.

### III. Implied Covenant

A. *Preliminary Considerations*

Robinson's contract of employment apparently was oral; no written contract was presented to the trial court, and none has been exhibited to us. Neither party here contends that the contract was in writing. ▮ ▮▮ ▮ Consequently we assume that the employment agreement had no specified term, and therefore was terminable at will by either party.[10] (Lab. Code, § 2922; *Tyco Industries, Inc.* v. *Superior Court* (1985) 164 Cal.App.3d 148, 154-155 [211 Cal.Rptr. 540].)

As noted in *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467 [199 Cal.Rptr. 613], recent appellate decisions have limited an employer's right to discharge an employee without cause. "Three distinct theories have been developed: (1) a tort cause of action for wrongful discharge in violation of public policy [citation]; (2) a cause of action for employer's breach of the implied covenant of good faith and fair dealing,

---

[10]If the agreement called for employment not to be performed within one year, it was required to be in writing under the statute of frauds. (See *Muñoz* v. *Kaiser Steel Corp.* (1984) 156 Cal.App.3d 965, 971 [203 Cal.Rptr. 345].)

which sounds both in tort and contract [citation]; and (3) a cause of action for employer's breach of an implied-in-fact covenant to terminate only for good cause [citation]." (*Id.* at pp. 475-476; accord, *Tyco Industries, Inc.* v. *Superior Court, supra,* 164 Cal.App.3d at p. 158, and *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 259-260 [215 Cal.Rptr. 860].)

Apparently Robinson relies upon the second and third theories just cited. He points to two cases, which we now summarize briefly.

In *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722] the plaintiff was a man who had been employed by an airline for eighteen years. He sued the airline for wrongful termination of employment, and alleged (among other things) that he had been discharged without a hearing, contrary to the provisions of the airline's own regulation. The trial court sustained demurrers to his complaint without leave to amend, and entered judgment accordingly. After reviewing several cases the Court of Appeal reversed, emphasizing two factors: the length of employment, and the airline's regulation. As to the length of employment, the court held that "[t]ermination of employment without legal cause after such a period of time offends the implied-in-law covenant of good faith and fair dealing contained in all contracts, including employment contracts." (*Id.*, at p. 455.) As to the regulation, the court said: "This policy involves the adoption of specific procedures for adjudicating employee disputes such as this one. While the contents of the regulation are not before us, its existence compels the conclusion that this employer had recognized its responsibility to engage in good faith and fair dealing rather than in arbitrary conduct with respect to *all* of its employees." (*Id.*, at p. 455, italics in original.) In summary, the court said: "[¶] In the case at bench, we hold that the longevity of the employee's service, together with the expressed policy of the employer, operate as a form of estoppel, precluding any discharge of such an employee by the employer without good cause." (*Id.*, at p. 456.)[11]

In *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917] the plaintiff had been employed by a candy manufacturer for 32 years.

---

[11]In *Newfield* v. *Insurance Co. of the West* (1984) 156 Cal.App.3d 440 [203 Cal.Rptr. 9], it was said that a cause of action for breach of an implied covenant of good faith and fair dealing could not be "based on that naked covenant alone," and that judicial rulings in which violations were found "were *always* predicated upon other public policy grounds, statutory violations, or express (or clearly implied) contract grounds, or upon a combination of elements (e.g., especially longevity of service together with some added element . . .)." (*Id.*, at p. 445, italics in original.) But the court in *Khanna* v. *Microdata Corp., supra,* 170 Cal.App.3d 250 disagreed and said this: "Even if this statement were correct, the mere fact that in past cases a violation of the implied covenant has been predicated on a limited variety of factual grounds does not in and of itself mean that those are the *only* grounds that will in the future suffice." (*Id.*, at pp. 263-264, italics in original.)

He sued the candy company for wrongful termination of employment. At trial he presented evidence (1) that he had been given commendations and promotions over many years; (2) that the company had given him assurances of advancement; and (3) that the company had a practice of not terminating administrative personnel except for good cause. At the close of his case-in-chief, the trial court granted a nonsuit. The Court of Appeal reversed, holding that the plaintiff had established a prima facie case of breach of an implied-in-*fact* promise of continued employment. Among other things the court said this: "[¶] In determining whether there exists an implied-in-fact promise for some form of continued employment courts have considered a variety of factors in addition to the existence of independent consideration. These have included, for example, the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged." (*Id.*, at p. 327; fns. omitted.) "[¶] Here, similarly, there were facts in evidence from which the jury could determine the existence of such an implied promise: the duration of appellant's employment, the commendations and promotions he received, the apparent lack of any direct criticism of his work, the assurances he was given, and the employer's acknowledged policies. While oblique language will not, standing alone, be sufficient to establish agreement [citation], it is appropriate to consider the totality of the parties' relationship: Agreement may be '"shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances."' [Citations.] We therefore conclude that it was error to grant respondents' motions for nonsuit as to See's." (*Id.*, at p. 329.)

## B. *The Evidence*

In its motion for summary judgment HP presented substantial evidence[12] that Robinson had been given oral and written warnings, and consultation and instruction, and had been fired solely because of his poor performance on the job. In opposition Robinson presented (1) early HP performance evaluations describing him as a "good" or "very good" worker; (2) deposition testimony concerning Giovanna Rosso's alleged racial slurs and her skepticism about Robinson's back injury; (3) a copy of the decision of an administrative law judge acting for the Unemployment Insurance Appeals Board, in which he found that "the claimant was discharged for something less than misconduct in connection with his work"; and (4) two pages from HP's "Personnel Policies and Guidelines." In pertinent part, the "Personnel Policies and Guidelines" provided that (a) "Supervisors and members of

---

[12]In this context we use the word "evidence" to mean declarations, deposition excerpts, and documentary exhibits, as distinguished from testimony given in open court.

the Personnel Department must make joint efforts to assure thorough, consistent, and equitable termination procedures"; and (b) "Any employee whose performance is unacceptable is not to be terminated until the supervisor is confident that the employee has received sufficient counseling and time to correct the substandard performance, and until the case has been fully documented and reviewed by the appropriate Functional, Personnel, and Division Manager."

## C. *Discussion*

■ We agree that there was evidence of an implied-in-fact promise made by HP not to terminate any of its employees without good cause. The promise is reflected not only in HP's "Personnel Policies and Guidelines," but also in the performance evaluations, warnings, and instruction actually given to Robinson.

■ As to breach of that promise, Robinson's argument is intricate. First, he contends that HP deliberately assigned him to a job which it knew he could not perform. In the words of his counsel, HP's scheme was this: "Give the man a job you know he can't do and then employ company procedure and policy, in bad faith, to make it look like his termination was justified." The difficulty with that proposition is that it is totally without any evidentiary support. As we pointed out in Part I, *ante,* the *only* evidence in the record concerning Robinson's transfer to product assembly indicates that HP decided "to give him the lightest possible work that we could find in the organization . . . ." Furthermore, prior to his transfer to the day shift Robinson had been performing switch inspections at only slightly less than the standard rate per day (see fn. 2, *ante*).

Second, Robinson contends that the administrative law judge acting for the Unemployment Insurance Appeals Board found that he was discharged for "something less than misconduct in his work"; that the finding is collateral estoppel on the issue; and therefore he was discharged for reasons other than poor performance on the job. This argument is well wide of the mark. ■ "[¶] Collateral estoppel has been held to bar relitigation of an issue decided at a previous [proceeding] if (1) the issue *necessarily* decided at the previous [proceeding] *is identical* to the one which is sought to be relitigated . . . ." (*People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622], italics added; accord, *People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321].) ■ The issue before the administrative law judge was whether Robinson had committed the kind of "misconduct" which would prohibit an award of unemployment compensation. ■ In unemployment compensation proceedings, the word "misconduct" is limited to "'. . . conduct evincing such wilful or wanton

disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. *On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity,* inadvertencies or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.'" (*Maywood Glass Co.* v. *Stewart* (1959) 170 Cal.App.2d 719, 724 [339 P.2d 947], italics added; accord, *Amador* v. *Unemployment Ins. Appeals Bd.* (1984) 35 Cal.3d 671, 678 [200 Cal.Rptr. 298, 677 P.2d 224].) In other words, mere poor performance cannot be equated with "misconduct." ■ Consequently the administrative law judge's finding did not preclude HP from showing that Robinson was discharged solely for poor performance.

Third, Robinson contends that he was given probation for a period of 60 days, and that he was fired before the 60 days elapsed, "completely without notice, cause, hearing or regard to [HP's] obligation of fairness and good faith . . . ." This argument also is devoid of evidentiary support. As pointed out in Part I, *ante,* the "Notice of Probation" plainly said that "[a]ny slip back to a previous unacceptable performance level . . . will be grounds for immediate termination." HP produced evidence showing that after Robinson was put on probation, his job performance continued to decline. There was no evidence to the contrary, and Robinson does not here contend otherwise.

Finally Robinson points to the racially biased comments of his supervisor, Giovanna Rosso. These comments cannot form the basis of a cause of action for breach of an implied covenant or promise of good faith and fair dealing. The Legislature has expressly declared an intent to occupy the field of racial discrimination in employment. Government Code section 12993, subdivision (c), provides: "[¶] While it is the intention of the Legislature to occupy the field of regulation of discrimination in employment and housing encompassed by the provisions of this part, exclusive of all other laws banning discrimination in employment and housing by any city, city and county, county, or other political subdivision of the state, nothing contained in this part shall be construed, in any manner or way, to limit or restrict the application of Section 51 of the Civil Code."[13] We must defer to that express

---

[13]Civil Code section 51 prohibits racial and other forms of discrimination "in all business establishments of every kind whatsoever."

legislative intent, and we decline to extend the tort concept of breach of implied covenant of good faith and fair dealing into the field of racial discrimination in employment. The Legislature has covered that field in the California Fair Employment and Housing Act (Gov. Code, §§ 12900-12996). (Cf. *Strauss* v. *A. L. Randall Co.* (1983) 144 Cal.App.3d 514, 518-520 [194 Cal.Rptr. 520] [Fair Employment and Housing Act "exclusive remedy for a wrongful discharge because of alleged age discrimination"].) As we point out in the next section, *post*, under the statutory scheme Robinson presented no prima facie case.

Accordingly the trial court correctly rejected Robinson's theory of breach of an implied covenant or promise of good faith and fair dealing.

### IV. RACIAL DISCRIMINATION

Robinson's next theory is based upon the "Exemplary Damages Attachment" incorporated in his first cause of action. It was there alleged, on information and belief, that Robinson's termination was "motivated, in whole or in part, by racial discrimination against this black plaintiff." In support of that allegation Robinson presented deposition testimony concerning Rosso's racial comments, which we already have described.

As previously noted, a cause of action for racial discrimination in employment is governed by statute. "[¶] Under both state and federal antidiscrimination legislation, *the employee must first establish a prima facie case* of wrongful, i.e., racial, or gender-based termination. [Citation.] This may be done by showing (1) that he or she belongs to a racial minority; (2) that he applied *and was qualified for a job* for which the employer was seeking applicants; (3) that *despite his qualification*, he was rejected; and (4) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."[14] (*County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 504 [200 Cal.Rptr. 381], italics added.) The "element which remains essential is that the minority applicant be qualified for the position for which he applies." (*Morita* v. *Southern Cal. Permanente Medical Group* (9th Cir. 1976) 541 F.2d 217, 219.) The purpose of antidiscrimination legislation "'is to eliminate discrimination, not to saddle management with unqualified employees.'" (*Ibid.*) These principles customarily have been applied in cases of discrimination in *hiring*. But they apply with equal force

---

[14]The quoted passage closely follows the opinion of the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802 [36 L.Ed.2d 668, 677-678, 93 S.Ct. 1817]. The Supreme Court there noted that "[t]he facts necessarily will vary . . . and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." (*Id.*, at p. 802, fn. 13.)

to instances of discrimination in *firing,* because the California Fair Employment and Housing Act specifically forbids an employer "to discharge the person from employment" because of racial discrimination. (Gov. Code, § 12940, subd. (a).)

■ Under the statutory theory, Robinson failed to establish a prima facie case. Uncontradicted evidence adduced in the trial court showed that his production rate steadily declined, and that in the end he was inspecting pushbutton switches at a rate well below the standard. Robinson himself told Peter Mosely of HP's personnel department that "he could not do the work and could not meet the terms of probation." As we noted in the preceding section of this opinion, on appeal Robinson contends that HP assigned him to a task *which he could not perform.* Even if initially "qualified," Robinson did not remain so. For whatever reason, in the end Robinson plainly was not qualified for the job, and no other suitable situation for him was shown to be available at HP.

We do not condone racial insults. As we point out in Part VI of this opinion, *post,* such insults are actionable under a different theory. But as to the statutory theory of wrongful termination because of racial discrimination, no prima facie case was presented and no triable issue of fact arose.

## V. Invasion of Privacy

■ Buried in Robinson's first alleged cause of action was an allegation that "[d]efendant HEWLETT-PACKARD caused plaintiff to be followed in his after-work hours by a sub-rosa investigator." ■ That allegation, made on information and belief, could not itself raise a triable issue of fact, for it is the rule that a party's own pleadings may not be used to oppose a motion for summary judgment. (*Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 563 [150 Cal.Rptr. 339]; and see *Coppinger* v. *Superior Court* (1982) 134 Cal.App.3d 883, 887 [185 Cal.Rptr. 24].) ■ In support of that allegation Robinson produced copy of a letter written by an agent of HP's insurance carrier to HP's counsel.[15] In pertinent part the letter read: "[¶] I have also scheduled a subrosa investigator to check our Mr. Robinson's activities to determine how disabled he is. I will keep you posted as to their results." In a deposition Robinson testified that he first became aware of the investigator when he obtained a copy of the letter.

In the trial court HP did not address the invasion of privacy issue in its motion for summary judgment, and in opposition to the motion Robinson's

---

[15]HP was self-insured. The letter was written on September 8, 1982, after Robinson had sustained his back injury. Robinson obtained a copy of the letter through discovery in the workers' compensation proceedings.

counsel made no mention of it. On appeal HP contends that since Robinson did not raise the issue in the trial court, he cannot do so for the first time here. Robinson counters by arguing that HP did not present the issue to the trial court, and therefore summary judgment on the issue should not have been granted.

The issue itself is not without interest,[16] but we do not address it here, for one salient reason: Robinson presented *no evidence whatever* that he *in fact* was followed by anyone at any time or in any place. Though the "subrosa investigator" may have been "scheduled," he may also have become ill, or have followed the wrong man, or have been assigned to some other task, or have been transferred or fired. There simply was no evidence of an actual surveillance.

Consequently we conclude that Robinson abandoned the issue in the trial court. HP's motion for summary judgment was addressed to the entire complaint; and while HP did not specifically address the claim of invasion of privacy, the thrust of its motion was to destroy Robinson's entire case.[17] If Robinson was serious about preserving his invasion of privacy claim, he had ample opportunity to do so. He took no advantage of the opportunity, and as a result no triable issue of fact was presented. "[P]ossible theories not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal." (*Johanson Transportation Service* v. *Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583, 588 [210 Cal.Rptr. 433].) Furthermore, "issues raised and then abandoned in the trial court also cannot be considered on appeal." (*Ibid.*)

## VI. Infliction of Emotional Distress

In his fourth cause of action Robinson alleged that his termination was effected "intentionally and maliciously for the purpose of causing

---

[16]We have found no California authority directly on point. According to one treatise, "[o]n the public street, or in any other public place, the plaintiff has no legal right to be alone; and it is no invasion of his privacy to do no more than follow him about and watch him there. Neither is it such an invasion to take his photograph in such a place, since this amounts to nothing more than making a record, not differing essentially from a full written description, of a public sight which anyone would be free to see." (Prosser & Keaton, Torts (5th ed. 1984), ch. 20, § 117, pp. 855-856; fns. omitted.) See also the note in 13 A.L.R.3d 1025-1029, in which the commentator states: "[I]t has been held that owing to the social utility of exposing fraudulent claims and because of the fact that some sort of investigation is necessary to uncover fictitious injuries, an unobtrusive investigation, even though inadvertently made apparent to the person being investigated, does not constitute an actionable invasion of his privacy." (Annot. (1967) 13 A.L.R.3d at p. 1027.)

[17]For example, HP prayed "for an order entering summary judgment in favor of defendant HP against plaintiff Robert Robinson on the ground that the complaint fails to raise a genuine issue as to any material fact."

plaintiff to suffer humiliation, mental anguish and physical distress . . . ." In a pretrial deposition Robinson testified to the following: "Listen, I'm going to tell you this. When I be bringing this up, man, you don't know how much this make me hurt. I don't want to drag it up, but I have to get it out. It's hurting feeling. I don't know when I'm going to get over the thing. But those people did something to me. They messed my life up. I know they did. When I talk about it, it frustrates me, for one thing."

HP's position was and is that it engaged in no conduct "sufficiently outrageous" to give rise to a cause of action for infliction of emotional distress. HP contends that the evidence of Rosso's racial comments, "even if it were true, simply does not constitute outrageous conduct as a matter of law." We disagree, because in two cases the California Supreme Court has suggested otherwise.

In *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216] plaintiff Alcorn was a Black truck driver employed by defendant Anbro. One day, in his capacity as shop steward for the Teamster's Union, Alcorn told another Anbro employee not to drive a certain truck at the job site, because the other employee was not a teamster. Then Alcorn told his supervisor what he had done. The supervisor allegedly shouted at Alcorn as follows: "'You goddam "niggers" are not going to tell me about the rules. I don't want any "niggers" working for me. I am getting rid of all the "niggers"; go pick up and deliver that 8-ton roller to the other job site and get your pay check; you're fired.'" (*Id.*, at pp. 496-497.) Anbro's secretary allegedly ratified the supervisor's acts. In a subsequent lawsuit Alcorn alleged that the supervisor's conduct "was intentional and malicious, and done for the purpose of causing plaintiff to suffer humiliation, mental anguish and emotional and physical distress . . . ." (*Id.*, at p. 497.) The trial court sustained a demurrer to the complaint without leave to amend, and entered judgment accordingly. The California Supreme Court reversed, and said this:

"Plaintiff has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendants' conduct was extreme and outrageous, having a severe and traumatic effect upon plaintiff's emotional tranquility. Thus, according to plaintiff, defendants, standing in a position or relation of authority over plaintiff, aware of his particular susceptibility to emotional distress, and for the purpose of causing plaintiff to suffer such distress, intentionally humiliated plaintiff, insulted his race, ignored his union status, and terminated his employment, all without just cause or provocation. Although it may be that mere insulting language, without more, ordinarily would not constitute extreme outrage, the aggravated circumstances alleged by plaintiff seem sufficient to uphold his complaint as against

defendants' general demurrer. 'Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'" (*Id.*, at pp. 498-499, fns. omitted.)

In *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58] plaintiff Agarwal was a native East Indian employed as a systems engineer by Arthur G. McKee & Company (McKee). Johnson was his department manager, and French was Johnson's assistant. French used racial epithets against Agarwal, including: "'You black nigger, member of an inferior race, get out and do it.'" (*Id.*, at p. 941.) French also said, "'You son-of-a-bitch, I am going to terminate you,'" (*id.*, at p. 942) without explaining or indicating that Agarwal had done anything wrong. French further recommended that Agarwal be fired for lack of job knowledge and lack of cooperation, both of which reasons were untrue. After he was dismissed, Agarwal brought suit against McKee, Johnson and French, alleging defamation and intentional infliction of emotional distress. A jury awarded Agarwal compensatory and punitive damages. On appeal the defendants argued that the evidence was not sufficient to support the verdict on intentional infliction of emotional distress. The Supreme Court disagreed, saying this:

"Agarwal here presented substantial evidence that French's use of the racial epithet was outrageous and that French acted knowingly and unreasonably with the intention to inflict mental distress and abused his position to humiliate Agarwal and also to recommend Agarwal's termination for reasons that were not true. The uncontroverted evidence indicated that until the last two days of his employment, Agarwal had not received any criticisms of his work or working relationship with others at McKee. Here, Regh, as personnel manager, did not insist on an apology from French; Johnson refused to provide a reason for the termination to Agarwal. Aufmuth [a senior vice-president] subsequently ratified the termination for the stated reasons that he knew were not true. Even assuming no ratification or authorization by McKee, the rule in this state is that the employer is liable for the wilful misconduct of his employees acting in a managerial capacity [citation]. The reason for the imposition of liability is to encourage careful selection and control of persons placed in important management positions [citation]. French and Johnson were agents of McKee and apparently had the authority to terminate Agarwal. We conclude that the evidence was sufficient to support the verdict on intentional infliction of emotional distress and the punitive damages as to French, Johnson and McKee." (*Id.*, at p. 947.)

Taken together these two cases suggest that an employer's use of racial slurs, against an employee who is susceptible to such slurs, may constitute

"outrageous" conduct. For example, in *Alcorn* v. *Anbro Engineering, Inc.,* *supra,* 2 Cal.3d 493, the court noted (1) that "[p]laintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants" (*id.,* at p. 498, fn. 2); and (2) "the slang epithet 'nigger' . . . has become particularly abusive and insulting in light of recent developments in the civil rights' movement as it pertains to the American Negro. . . . Plaintiff's own susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer." (*Id.,* at pp. 498-499, fn. 4.) And in *Agarwal* v. *Johnson, supra,* 25 Cal.3d 932 the court held: "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (*Id.,* at p. 946.)

Here, Robinson presented evidence (1) that Giovanna Rosso held a supervisory position over him;[18] (2) that in the employment setting she intentionally insulted him and his race; and (3) that he suffered emotional distress. ██ Under *Alcorn* and *Agarwal, supra,* we conclude that such evidence raised a triable issue of fact as to whether HP engaged in "outrageous" conduct.[19] We cannot, and do not, speculate as to how the triable issue should be resolved.

## VII. Retaliation

 Robinson's next theory is that HP terminated him in retaliation for his attempt to exercise his legal rights. He presented evidence showing that he had requested the presence of his attorney at any conference in which HP's representatives discussed the quality and quantity of his work. In the court below, as here, he based his argument on the provisions of Labor

---

[18]There may be a triable issue as to whether Rosso acted in a "managerial capacity." The evidence on this point is unclear, and the matter has not been briefed. Apparently Rosso had the authority to fire Robinson, but she could not do so without the approval of others. (See *Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 947.)

[19]We do not hold that *every* racial insult amounts to outrageous conduct, or gives rise to a cause of action. "[I]t is generally held that there can be no recovery for mere profanity, obscenity, or abuse, without circumstances of aggravation, or for insults, indignities or threats which are considered to amount to nothing more than mere annoyances. The plaintiff cannot recover merely because of hurt feelings." (Prosser & Keaton, Torts, *supra,* ch. 2, § 12, pp. 59-60; fns. omitted.)

Code section 923[20] and upon a sentence in *Montalvo* v. *Zamora* (1970) 7 Cal.App.3d 69 [86 Cal.Rptr. 401] which reads as follows: "We believe it to be within the intent and scope of the statute, by implication, though not expressly declared, that the individual employee has the right to designate an attorney or other individual to represent him in negotiating terms and conditions of his employment, and that his discharge for so doing constitutes a violation of Labor Code section 923." (*Id.,* at p. 75.)[21] For its part, HP contends that Robinson's "retaliation" claim is preempted by federal statutes governing the same subject.

We do not find the issue of "retaliatory termination" anywhere in Robinson's complaint. Robinson insists that it was buried in the cryptic sentence in his fourth cause of action, which reads: "Additionally, said termination is against the public policy of this state." But the mere allegation of a public policy violation does not suffice to state a cause of action, particularly where no clue is given as to which public policy allegedly has been violated. (*Tyco Industries, Inc.* v. *Superior Court, supra,* 164 Cal.App.3d at p. 159.) ▮ "[A] motion by a *defendant* under section 437c of the Code of Civil Procedure necessarily includes a test of the sufficiency of the complaint . . . . Motions for summary judgment in such situations have otherwise been allowed as being in legal effect motions for judgment on the pleadings." (*C. L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483], italics in original.) "Thus, if the reviewing court finds the complaint fails to state facts sufficient to constitute a cause of action as a matter of law, it need not reach the question whether plaintiff's opposition to the summary judgment motion raises a triable issue of fact." (*Rowe* v. *Wells Fargo Realty Services, Inc.* (1985) 166 Cal.App.3d 310, 316 [212 Cal.Rptr. 374].)

▮ Furthermore, it appears that Robinson's "retaliatory termination" theory first appeared in his opposition to HP's motion for summary judgment.

---

[20]Labor Code section 923 reads as follows: "In the interpretation and application of this chapter, the public policy of this State is declared as follows: [¶] Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

[21]The Court of Appeal in *Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159] expressed doubt as to the accuracy of this statement, and pointed out that in *Montalvo* "in fact several employees banded together in designating an attorney to represent them." (*Id.,* at p. 297.)

■ It is well settled that documentary evidence filed in opposition to a defendant's motion for summary judgment may not create issues outside the pleadings, nor is it a substitute for an amendment to the pleadings. (*Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 414 [175 Cal.Rptr. 365].)

■ Finally, we note that the Labor Code speaks plainly of "negotiations" concerning "terms and conditions of labor." The plaintiffs in *Montalvo* v. *Zamora, supra,* 7 Cal.App.3d 69 attempted to negotiate to obtain certain hourly wage rates for agricultural workers. (*Id.*, at pp. 72-73.) But the statutory phrase "terms and conditions of labor" says nothing about an employee's performance standard. Interpreted in its broadest form, we cannot discern in the wording of the statute any legislative intent to the effect that an employee has the right to have an attorney present at any time his boss discusses with him his good or poor performance. An employer has the right to voice legitimate criticism of an employee's poor performance, and the employee likewise has a right to gripe about poor equipment and poor management. If an attorney is required at every informal job performance evaluation, every such evaluation would evolve into a mini-trial, and that would have serious effects on a given plant's efficiency. We think "terms and conditions of labor" refers precisely to that: terms and conditions. Performance on the job is quite another matter.

Accordingly, the trial court properly rejected Robinson's theory of "retaliatory termination."

## VIII. DISPOSITION

We hold that the evidence below raised a triable issue of fact as to whether HP engaged in "outrageous" conduct which would support a claim of intentional inflection of emotional distress. As to that issue the judgment is reversed. In all other respects the judgment is affirmed. Each party to bear his own costs.

Agliano, P. J., and Phillips, J.,* concurred.

A petition for a rehearing was denied August 20, 1986.

---

*Assigned by the Chairperson of the Judicial Council.