706 A.2d 685

CARRIE TAYLOR, PLAINTIFF–APPELLANT, v. HENRY
W. METZGER, BURLINGTON COUNTY SHERIFF,
DEFENDANT–RESPONDENT.

Argued September 9, 1997—Decided February 18, 1998.

*Clifford L. Van Syoc*, argued the cause for appellant (*Clifford L. Van Syoc*, attorney; *Evan A. Blaker*, on the brief).

*William B. Scatchard, Jr.*, argued the cause for respondent (*Capehart & Scatchard*, attorneys; *Mr. Scatchard* and *Alison M. Nissen*, on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The central issue in this appeal is whether a single derogatory racial comment directed against a subordinate employee by a supervisor can create a hostile work environment in violation of the Law Against Discrimination. A closely-related issue is whether, the utterance of this comment also constitutes the tort of the intentional infliction of emotional distress.

The employee in this case, a county sheriff's officer, claims that her employer, the county sheriff, uttered a racial epithet against

her in the presence of another supervisor, the undersheriff. The victim filed a complaint against the sheriff alleging primarily that the racial insult constituted a violation of the Law Against Discrimination.

The trial court entered a summary judgment for defendant on that claim. The court also dismissed other counts of the complaint, namely, intentional infliction of emotional distress, prima facie tort, and violation of federal civil rights statutes.[1] The Appellate Division affirmed that judgment in an unreported decision. This Court granted plaintiff's petition for certification. 147 *N.J.* 578, 688 *A.*2d 1053 (1997).

## I

Because this case was determined on the basis of summary judgment, the evidence must be evaluated under this Court's summary judgment standard. That standard precludes summary judgment if the competent evidence, when viewed in the light most favorable to the non-movant, is sufficient to permit a rational factfinder to resolve the disputed factual issues in favor of the non-moving party. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). The evidence assessed under that standard supports the following facts.

In 1972, plaintiff Carrie Taylor began working as a sheriff's officer in the office of the Burlington County Sheriff. On January 31, 1992, Taylor, who is African American, was at the Burlington County Police Academy for firearms training and weapons qualification. While there, she encountered defendant Henry Metzger and Undersheriff Gerald Isham. Taylor said hello, and, in response, Metzger turned to Isham and stated: "There's the jungle bunny." Isham laughed. Plaintiff believed the remark to be a demeaning and derogatory racial slur, but she did not reply. She became a "nervous wreck," immediately began crying, and went to

---

1 Plaintiff does not appeal the dismissal of her federal claims.

the bathroom. Taylor subsequently returned to the Police Academy classroom, in which she was the only African American and the only woman. Holding back tears, she related her experience to co-workers. The officers laughed; one responded: "I'm a black Irishman." This comment further offended plaintiff, who felt their reactions were insensitive.

Taylor thereafter consulted with her union attorney and a member of the union grievance committee. On February 5, 1992, accompanied by two union grievance committee members, Taylor met with Metzger and Undersheriff Davis. Plaintiff spoke to defendant about her grievance and demanded a written apology. Defendant stating that he had used the phrase "jungle bunny" with a different connotation in the Marine Corps, claimed that he was not aware that the remark had a derogatory connotation. Plaintiff told defendant that the remark was very insulting and degrading. However, defendant badgered plaintiff for interpreting the remark as a racial slur and brought her to tears. At that point, Undersheriff Davis said that, without a doubt, the statement was offensive. Defendant then stated that he needed to think before deciding whether to apologize in writing and explained that plaintiff could use such a letter against him.

The following day, defendant summoned Taylor to meet with him. Metzger offered a written apology in which he admitted that he called Taylor a "jungle bunny," but also claimed that Taylor had worn camouflage fatigues at the time of the comment. Taylor refused to accept the apology because the description of her clothing was not factually accurate; in fact, she had worn blue jeans and a navy sweatshirt. Defendant hassled her for rejecting the letter for that reason.

On February 10, 1992, Taylor again met with defendant. Metzger again attempted to present a letter of apology to Taylor. Stating that she would like an attorney present before accepting anything from Metzger, she refused the letter.

Taylor disclosed the circumstances of the event to the media and, as a result, the incident was publicized in several newspapers,

including the *Philadelphia Inquirer, Courier Post,* and *Burlington County Times.* Thereafter, plaintiff received harassing telephone calls and one piece of hate mail. She filed a report with the Willingboro Police Department regarding the harassment and changed her telephone number to an unlisted one.

Following the incident, plaintiff did not lose any income and her basic job duties remained unchanged. However, she lost her position as floor supervisor. Despite the fact that she was told that only sergeants were eligible for that position, she believed the incident caused her to lose the position. Plaintiff felt she suffered a loss of dignity and self-respect. Other sheriff's officers acted coolly toward her and were afraid to talk to her. She was labeled a troublemaker and believed that her co-workers were told to stay away from her. One, who had attended the February 5 meeting, was subsequently told to "bow out" of the matter; he feared continued involvement with plaintiff's grievance.

Plaintiff claims that the incident caused her emotional distress for which she consulted a psychiatrist, Dr. Ira L. Fox, on a periodic basis between May 1992 and March 1993. She was scared and remained "a nervous wreck." She was afraid to leave work by herself and lived in constant fear of reprisal; she bought a bullet-proof vest. Plaintiff suffered from severe middle and nighttime insomnia; experiencing nightmares and flashbacks of the incident, she would wake up hourly and then have trouble falling back asleep. She also had mood changes and developed a psychiatric itch. Taylor told Dr. Fox that she had been losing her hair since the incident. Dr. Fox treated her with an anxiolytic, Ativan. He diagnosed her with "adjustment disorder with mixed emotional features" and later revised that diagnosis to "post-traumatic stress disorder." He concluded that her disorder was "directly related to and caused by the incident to her person when she was reportedly called a jungle bunny by Mr. Metzger." Although Dr. Fox determined that plaintiff still needed ongoing psychotherapy to deal with the emotional stress arising out of

defendant's remark, plaintiff stopped seeing Dr. Fox in March 1993 because she could no longer afford the therapy.

## II

The Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42, prohibits discrimination "because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for service in the Armed Forces of the United States, or nationality." *N.J.S.A.* 10:5–3. The gravamen of the complaint filed by plaintiff against Metzger is the allegation that the racial comment he directed against her constituted racial harassment, an act of discrimination in violation of the LAD.

In *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993), this Court formulated the basic standard for determining whether acts of harassment in the workplace constitute invidious discrimination in violation of the LAD. When a black plaintiff alleges racial harassment under the LAD, she must demonstrate that the defendant's "conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a(3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Id.* at 603–04, 626 *A.*2d 445 (emphasis omitted).

The Court in *Lehmann* specifically adopted the "severe or pervasive" test as part of its comprehensive standard. *Id.* at 606–07, 626 *A.*2d 445. That test conforms to the standard for establishing workplace racial or gender harassment under federal Title VII law. *See Meritor Sav. Bank v. Vinson,* 477 *U.S.* 57, 67, 106 *S.Ct.* 2399, 2405, 91 *L.Ed.*2d 49, 60 (1986) (holding that in order to demonstrate hostile work environment, plaintiff must allege that unwelcome conduct was "sufficiently *severe or pervasive* to alter the conditions of employment and create an abusive work environment" (emphasis added)). In choosing its test, the Court clearly

rejected an alternative regular-and-pervasive test that requires repetitive or recurrent acts to establish workplace harassment; that test would bar harassment-discrimination actions that were "based on a single, extremely severe incident." *Lehmann, supra,* 132 *N.J.* at 606, 626 *A.2d* 445. Consequently, under the chosen standard—severe or pervasive conduct—one incident of harassing conduct can create a hostile work environment. *Id.* at 606–07, 626 *A.2d* 445.

Other courts have also recognized that under the severe-or-pervasive test a single incident of invidious harassment can create a hostile work environment. *E.g., Torres v. Pisano,* 116 *F.*3d 625, 631 n. 4 (2d Cir.) ("Of course, even a single episode of harassment, if severe enough, can establish a hostile work environment."), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 563, 139 *L. Ed.*2d 404 (1997); *Rodgers v. Western–Southern Life Ins. Co.,* 12 *F.*3d 668, 674 (7th Cir.1993) ("Within the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim."); *Daniels v. Essex Group, Inc.,* 937 *F.*2d 1264, 1274 n. 4 (7th Cir.1991) (indicating a single instance of racial harassment can establish a hostile work environment); *Vance v. Southern Bell Tel. & Tel. Co.,* 863 *F.*2d 1503, 1511 (11th Cir.1989) ("It is thus incorrect to apply mechanically an absolute numerical standard to the number of acts of harassment which must be committed by the defendant before a jury may reasonably find that a hostile environment exists."); *Reid v. O'Leary,* No. Civ. A. 96–401, 1996 *WL* 411494 (D.D.C. July 15, 1996) (holding that use of one epithet created an issue of material fact regarding whether the plaintiff's work environment was hostile); *see Del Valle Fontanez v. Aponte,* 660 *F.Supp.* 145, 149 (D.P.R.1987) (recognizing that a single sexual advance can constitute sexual harassment); *Nadeau v. Rainbow Rugs,* 675 *A.*2d 973, 976 (Me.1996) (observing that a single incident of sexual harassment may be sufficient to reach jury); *Radtke v. Everett,* 442 *Mich.* 368, 501 *N.W.*2d 155, 168 (1993) (same); *see also Rocha Vigil v. City of Las Cruces,* 119

*F.*3d 871, 873 (10th Cir.1997) (Lucero, J., dissenting) ("If sufficiently severe, harassment is actionable under Title VII—regardless of its pervasiveness or frequency."). The Equal Employment Opportunity Commission (EEOC) also recognizes that a single incident, if sufficiently severe, can create a hostile environment. *Schott v. Runyon,* No. 4–G–1381–92, 1996 *WL* 350896 (E.E.O.C. June 20, 1996) (citing *EEOC Policy Guidance on Current Issues of Sexual Harassment,* Notice N–915–050, at 104 (March 19, 1990)). Nevertheless, while it "is certainly possible" that a single incident, if severe enough, can establish a prima facie case of a hostile work environment, "it will be a rare and extreme case in which a single incident will be so severe that it would, from the perspective of a reasonable [person situated as the claimant], make the working environment hostile." *Lehmann, supra,* 132 *N.J.* at 606–07, 626 *A.*2d 445.

Here, the basic issue of law is whether the single remark uttered by defendant was, from the perspective of a reasonable African American, sufficiently severe to have produced a hostile work environment. Because this case was determined by summary judgment, the key question and more pointed inquiry is whether a rational factfinder could reasonably determine on the basis of plaintiff's evidence that the racial insult directed at her by the sheriff in the presence of the undersheriff was, under the surrounding circumstances, sufficiently severe to have created a hostile work environment.

Usually repeated racial slurs must form the basis for finding that a hostile work environment has been created. *E.g. Amirmokri v. Baltimore Gas & Elec. Co.,* 60 *F.*3d 1126, 1131 (4th Cir.1995) (finding a prima facie case of national origin harassment because of repeated ethnic slurs uttered toward an Arab–American employee); *Boutros v. Canton Regional Transit Auth.,* 997 *F.*2d 198, 204 (6th Cir.1993) (same); *Davis v. Monsanto Chem. Co.,* 858 *F.*2d 345, 349 (6th Cir.1988) (stating repeated slurs are necessary to establish a racial harassment claim), *cert. denied,* 490 *U.S.* 1110, 109 *S.Ct.* 3166, 104 *L.Ed.*2d 1028 (1989); *Erebia v.*

*Chrysler Plastic Prod. Corp.*, 772 *F*.2d 1250, 1256 (6th Cir.1985) (holding repeated racial slurs created a hostile work environment), *cert. denied*, 475 *U.S.* 1015, 106 *S.Ct.* 1197, 89 *L.Ed*.2d 311 (1986); *Rogers v. Equal Employment Opportunity Comm'n*, 454 *F*.2d 234, 238 (5th Cir.1971) (same), *cert. denied*, 406 *U.S.* 957, 92 *S.Ct.* 2058, 32 *L.Ed*.2d 343 (1972). Generally, " 'mere utterance of an … epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 *U.S.* 17, 21, 114 *S.Ct.* 367, 370, 126 *L. Ed.*2d 295, 302 (1993) (quoting *Meritor, supra*, 477 *U.S.* at 67, 106 *S.Ct.* at 2405, 91 *L. Ed.*2d at 60); *see also Bolden v. PRC Inc.*, 43 *F*.3d 545, 551 (10th Cir.1994) (holding two racial slurs insufficiently severe because there was no barrage of opprobrious racial comments), *cert. denied*, 516 *U.S.* 826, 116 *S.Ct.* 92, 133 *L. Ed.*2d 48 (1995).

Some courts have found that a particularly offensive remark, if not repeated, will not be sufficient to establish a hostile work environment. *E.g., McCray v. DPC Indus., Inc.*, 942 *F.Supp.* 288, 293 (E.D.Tex.1996) (holding sporadic racial slurs by co-workers insufficiently severe to establish a hostile work environment); *Bivins v. Jeffers Vet Supply*, 873 *F.Supp.* 1500, 1508 (M.D.Ala. 1994) (holding a co-worker once calling the plaintiff a "nigger" insufficiently severe to establish a hostile work environment), *aff'd*, 58 *F*.3d 640 (11th Cir.1995); *Reese v. Goodyear Tire & Rubber Co.*, 859 *F.Supp.* 1381, 1385, 1387 (D.Kan.1994) (holding a manager insinuating that all black people abused drugs insufficiently severe to establish a hostile work environment); *Bennett v. New York City Dep't of Corrections*, 705 *F.Supp.* 979, 983 (S.D.N.Y.1989) (concluding that corrections officer's remark, "hey black bitch, open the … gate," to another officer did not amount "to more than a mere episodic event of racial antipathy" and was insufficient to sustain a claim of a racially hostile work environment).

Nevertheless, a single utterance of an epithet can, under particular circumstances, create a hostile work environment. As expressed by the court in *Nadeau, supra*, although

many of the cases considering hostile environment harassment claims[ ] involve a pattern of inappropriate conduct, there is no requirement that harassment occur more than one time in order to be actionable. The standard contemplates conduct that is either severe or pervasive. Although the conduct may be both, only one of the qualities must be proved in order to prevail. The severity of the conduct may vary inversely with its pervasiveness. Whether the conduct is so severe as to cause the environment to become hostile or abusive can be determined only by considering all the circumstances, and this determination is left to the trier of fact.

[675 A.2d at 976.]

The connotation of the epithet itself can materially contribute to the remark's severity. Racial epithets are regarded as especially egregious and capable of engendering a severe impact. *See* Robert J. Gregory, *You Can Call Me a "Bitch" Just Don't Use the "N-word": Some Thoughts on Galloway v. General Motors Service Parts Operations and Rodgers v. Western Southern Life Insurance Co.*, 46 *DePaul L.Rev.* 741, 748 (1997) ("Courts have viewed racist epithets as beyond the pale, regardless of the prevalence of these epithets in the workplace."). The meaning of a racial epithet is often a critical, if not determinative, factor in establishing a hostile work environment. *E.g., Rodgers, supra,* 12 *F.*3d at 675 (noting that the term "nigger" is an unambiguously racist epithet); *Reid, supra,* 1996 *WL* 411494, at *4 (ruling that "it is very possible that the term 'Coon–Ass' is racially derogatory or severe enough, in and of itself, to create a hostile work environment"); *Bailey v. Binyon,* 583 *F.Supp.* 923, 927 (N.D.Ill.1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se . . . ."); *see also Rocha Vigil, supra,* 119 *F.*3d at 873 n. 3 (Lucero, J., dissenting) (*Harris, supra,* "does not mean that [a] severely degrading, racially derogatory insult of the worst kind escapes actionability under Title VII simply because it is used only occasionally.").

In this case, defendant's remark had an unambiguously demeaning racial message that a rational factfinder could conclude was sufficiently severe to contribute materially to the creation of a hostile work environment. The term defendant used, "jungle bunny," is patently a racist slur, and is ugly, stark and raw in its

opprobrious connotation. *See Washington v. Court of Common Pleas of Phila. County,* 845 *F.Supp.* 1107, 1110 (E.D.Pa.1994) (recognizing that "jungle bunny" is a racist remark), *rev'd on other grounds,* 47 *F.*3d 1163 (3d Cir.1995). In common parlance, "jungle bunny" is a racial slur directed at blacks. *The Dictionary of Contemporary Slang* 285 (1st Ed.1990); Paul Beale, *A Concise Dictionary of Slang and Unconventional English* 244 (1st American Ed.1989). It is a slur that, in and of itself, is capable of contaminating the workplace. *Bolden v. ABF Fabricators, Inc.,* 864 *F.Supp.* 1132, 1133–34 (N.D.Ala.1994) (referring to black people as "jungle bunnies," among other slurs, created a racist working environment); *cf. Resetar v. State Bd. of Educ.,* 284 *Md.* 537, 399 *A.*2d 225, 238 (1979) (upholding dismissal of schoolteacher for referring to black students within earshot as "jungle bunnies" because the epithet is sufficiently vicious), *cert. denied,* 444 *U.S.* 838, 100 *S.Ct.* 74, 62 *L.Ed.*2d 49 (1979). Racial slurs are a form of vilification that harms the people at whom they are directed. *See* Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story,* 87 *Mich. L.Rev.* 2320, 2338 (1989) ("However irrational racist speech may be, it hits right at the emotional place where we feel the most pain."); Charles R. Lawrence III, *If He Hollers Let Him Go: Regulating Racist Speech on Campus,* 1990 *Duke L.J.* 431, 452 (1990) ("The experience of being called 'nigger,' 'spic,' 'Jap,' or 'kike' is like receiving a slap in the face. The injury is instantaneous.").

Further, the severity of the remark in this case was exacerbated by the fact that it was uttered by a supervisor or superior officer. Defendant was not an ordinary co-worker of plaintiff; he was the Sheriff of Burlington County, the chief executive of the office in which plaintiff worked. That fact greatly magnifies the gravity of the comment.

■ A supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace. *See Lehmann, supra,* 132 *N.J.* at 622–23, 626 *A.*2d 445 (holding an

employer was vicariously liable for sexual harassment if it had knowledge of the harassment but failed to stop it promptly and effectively). An employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs. *Payton v. New Jersey Turnpike Auth.*, 148 *N.J.* 524, 537, 691 *A.*2d 321 (1997) (holding that an employer's remedial response to complaints of harassment is relevant to an employee's discrimination claim); *Amirmokri, supra*, 60 *F.*3d at 1131 (imposing liability for employer's failure to take prompt action calculated to end ethnic harassment after becoming aware of it); *Ellison v. Brady*, 924 *F.*2d 872, 882 (9th Cir.1991) (requiring an employer to end sexual harassment); *Davis, supra*, 858 *F.*2d at 349 (shielding an employer from liability because it "took quick and appropriate measures to remedy the situation"); Peter M. Panken et al., *Sexual Harassment in the Workplace: Employer Liability for the Sins of the Wicked*, SB36 *A.L.I.—A.B.A.* 203, 228 (1997) (recognizing employers lessen liability by having an effective and responsive complaint procedure).

Here, defendant did more than merely allow racial harassment to occur at the workplace, he perpetrated it. That circumstance, coupled with the stark racist meaning of the remark, immeasurably increased its severity. In *Rodgers, supra*, the court noted that "a supervisor's use of [a racial slur] impacts the work environment far more severely than use by co-equals." 12 *F.*3d at 675. In *Nadeau, supra*, the court concluded that a single incident of sexual harassment by the highest-ranking employee of the company could reasonably be found "sufficiently severe to alter the conditions of employment and to create an abusive or hostile work environment." 675 *A.*2d at 974; *see also King v. Hillen*, 21 *F.*3d 1572, 1580 (Fed.Cir.1994) (noting the EEOC's Policy Guidelines on Sexual Harassment states that "consideration should be given to the type of conduct (verbal or physical), its frequency, its offensiveness, the hostility of the conduct, *whether the harasser is a co-worker or a supervisor,* and the number of persons at whom the harassment was directed" (emphasis added)); *cf. In re Sea-*

*man,* 133 *N.J.* 67, 94, 627 *A.*2d 106 (1993) (stressing that the sexual harassment by a judge directed to his law clerk was especially egregious because of the judge's authority and superior position).

The Sheriff of Burlington County is a high-ranking law enforcement officer. That fact is of significance when evaluating the effect of his remark on a subordinate. Any remark from such an individual carries with it the power and authority of the office. Because the sheriff was both plaintiff's superior and her offender, plaintiff could not seek the redress that would otherwise be available to a victim of invidious workplace harassment, namely, resort to her own supervisor. *See Radtke, supra,* 501 *N.W.*2d at 168 (stating that "because the perpetrator of the alleged [sexual harassment] was the employer, recourse to the employer was fruitless," and holding that "[t]he alleged conduct, combined with the reality that the employer was the perpetrator, permits [the] single incident to be sufficient to reach the jury"). Indeed, plaintiff's dilemma was acute and insoluble. She had nowhere to turn. When plaintiff did turn to defendant, she did not receive any redress or protection whatsoever, let alone comfort, solace or contrition. Rather, she was rebuffed and further agitated, to the point of tears, for taking offense to a remark that was clearly a slur against her race.

■ The test of severity adopted by this Court in *Lehmann* does not in all cases require evidence of an actual change in working conditions in order for there to be a hostile work environment. The Court in *Lehmann, supra,* stated: "[D]iscrimination itself *is* the harm that the LAD seeks to eradicate...." 132 *N.J.* at 610, 626 *A.*2d 445. "It is the harasser's conduct, not the plaintiff's injury, [and 'not the alteration of the conditions of employment,' *Muench v. Township of Haddon,* 255 *N.J.Super.* 288, 299, 605 *A.*2d 242 (App.Div.1992) (citation omitted),] that must be severe or pervasive." *Lehmann, supra,* 132 *N.J.* at 610, 626 *A.*2d 445.

Severity and workplace hostility are measured by surrounding circumstances. An offensive remark directed against a black employee must under the circumstances be "severe or pervasive enough to make a ... reasonable [African American] believe that ... the conditions of employment are altered and the working environment is hostile or abusive." *Id.* at 603–04, 626 *A.*2d 445. The comment in context must be viewed from the perspective of a reasonable African American situated as the plaintiff. *See Torres, supra,* 116 *F.*3d at 632–33 (using a reasonable Puerto Rican standard for a Puerto Rican plaintiff); *Aman v. Cort Furniture Rental Corp.,* 85 *F.*3d 1074, 1081 (3d Cir.1996) (stating that plaintiff must show racial harassment "would detrimentally affect a reasonable person of the same race in that position"); *Dickerson v. State of N.J., Dep't of Human Servs.,* 767 *F.Supp.* 605, 616 (D.N.J.1991) (stating that standard is a reasonable person of plaintiff's race).

A rational factfinder may conclude that under the circumstances a reasonable African American could believe that, when the chief executive of her office calls her a "jungle bunny," he thinks she has less worth as a person and is inferior to other employees because of her race. Moreover, a jury could reasonably find that the reasonable African American would believe that such a remark made in the presence of another supervising officer portrays an attitude of prejudice that injects hostility and abuse into the working environment and significantly alters the conditions of her employment. *See Rodgers, supra,* 12 *F.*3d at 675 ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (citation and internal quotations omitted)).

The circumstances—that the insult was clearly a racist slur, that it was directed against plaintiff, that it was uttered by the chief ranking supervisor of her employ, the Sheriff of Burlington County, and that it was made in the presence of another supervising

officer—were sufficient to establish the severity of the harassment and alter the conditions of plaintiff's work environment.

Undoubtedly, in some, perhaps most, cases, evidence that the hostility or abuse deleteriously alters the conditions of employment is necessary in order to establish the requisite severity of the discrimination. *See Lehmann, supra,* 132 *N.J.* at 610, 626 *A.*2d 445. As observed by the Court in *Lehmann, supra:* "One cannot inquire whether the alleged conduct was 'severe or pervasive' without knowing *how* severe or pervasive it must be." 132 *N.J.* at 604, 626 *A.*2d 445. However, despite the dissent's contention, *infra* at 525–27, 706 *A.*2d at 702–03, evidence of specific, tangible adverse changes in the work environment is not required in order to state a LAD racial harassment claim. "[A] loss of a tangible job benefit is not necessary since the harassment itself affects the terms or conditions of employment." *King v. Board of Regents of Univ. of Wis. Sys.,* 898 *F.*2d 533, 537 (7th Cir.1990); *see also Nadeau, supra,* 675 *A.*2d at 976 (holding that a single instance of sexual harassment may have altered the plaintiff's working conditions although she was able to retain her job position); *Radtke, supra,* 501 *N.W.*2d at 168 (holding that a single instance of sexual harassment may have altered the plaintiff's working conditions although she did not allege that there had been tangible changes to her working environment).

Moreover, there are circumstances that indicate that the conditions of plaintiff's employment were in fact altered by the racist remark. Prior to January 31, 1992, plaintiff had never been the target of racial epithets at work. But, that changed when defendant made his remark.

The offensive remark was made in the presence of another supervising officer. When plaintiff told her co-workers of defendant's remark, they laughed, and one apparently mocked her. Moreover, plaintiff had no realistic opportunity for redress. Defendant indirectly persisted in perpetuating the harassment and its hostile impact. When plaintiff confronted defendant about his comment, he would not acknowledge that he had vilified her.

Instead, he badgered her for interpreting the remark as a racial slur. He was reluctant to apologize. His first proffered letter did not constitute a sincere apology; rather, it evaded the patent racial import of the epithet defendant had used by falsely stating that plaintiff had worn fatigues at the time of the comment. Thereafter, her co-employees acted coolly toward her; she was labeled a troublemaker. They were afraid to talk to her and created the impression that they had been told to stay away from her. Consequently, a rational factfinder, crediting such evidence, may conclude that defendant's racial slur altered plaintiff's working conditions.

"This Court has described the goal of the LAD as being 'nothing less than the eradication of the cancer of discrimination.'" *Hernandez v. Region Nine Hous. Corp.*, 146 *N.J.* 645, 651–52, 684 *A.*2d 1385 (1996) (quoting *Fuchilla v. Layman*, 109 *N.J.* 319, 334, 537 *A.*2d 652, *cert. denied*, 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L. Ed.*2d 51 (1988)). We have recognized: "No purpose is served by allowing that harm to go unremedied merely because it was brought about by a single, severe incident of harassment rather than by multiple incidents of harassment." *Lehmann, supra*, 132 *N.J.* at 607, 626 *A.*2d 445.

█ Accordingly, we conclude plaintiff has presented adequate evidence of the severity of defendant's remark to create a genuine issue of material fact sufficient to survive defendant's motion for summary judgment. A rational factfinder, crediting plaintiff's evidence, could conclude that defendant engaged in discriminatory harassment by uttering a racial epithet that was sufficiently severe to have created a hostile work environment. We reverse the order of summary judgment for defendant on the claim of LAD racial discrimination based on workplace harassment.

## III

Citing the insufficiency of plaintiff's allegations and evidence of any severe emotional injury, the trial court dismissed petitioner's claim for intentional infliction of emotional distress. The Appel-

late Division affirmed the dismissal. In addressing the issue of the adequacy of plaintiff's claim, we are again remitted to the standard governing whether the evidence, when viewed in the light most favorable to the non-moving party, is "sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146. We also note, preliminarily, that the evidence that would be relevant to plaintiff's claim of emotional injury would overlap, if not duplicate, that proffered to establish her LAD claim. To that extent, plaintiff is precluded from obtaining a double recovery.

In *Buckley v. Trenton Sav. Fund Soc'y,* 111 *N.J.* 355, 365–67, 544 *A.*2d 857 (1988), this Court first recognized a cause of action for intentional infliction of emotional distress. In order to state such a cause of action, "plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Id.* at 366, 544 *A.*2d 857.

"The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Ibid.* (quoting *Restatement (Second) of Torts,* § 46 cmt. d). "'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.,* 227 *N.J.Super.* 449, 472, 547 *A.*2d 1134 (App.Div. 1988) (quoting *Restatement, supra,* § 46 cmt. d). A racial slur uttered by a sheriff directed against a subordinate officer is not, as a matter of law, a mere insult or triviality. A rational jury could reasonably conclude that defendant's conduct was atrocious and intolerable. *See Lenoir v. Roll Coater, Inc.,* 13 *F.*3d 1130, 1132 n. 1 (7th Cir.1994) (subjecting employee to repeated racial and ethnic slurs was intolerable); *Whelan v. Albertson's, Inc.,* 129 *Or.App.* 501, 879 *P.*2d 888, 891 (1994) ("[R]acial and ethnic slurs can be socially intolerable."). In *City of Minneapolis v. Richardson,* 307 *Minn.* 80, 239 *N.W.*2d 197, 203 (1976), the Minnesota

Supreme Court pronounced: "The use of the term 'nigger' has no place in the civil treatment of a citizen by a public official." Likewise, when defendant called plaintiff a "jungle bunny," he may have stepped beyond our civilized community's bounds of decency. A jury should determine whether defendant's remark was outrageous or merely an insult.

We recognize that many jurisdictions have held that a supervisor's utterance of racial slurs toward his subordinates is not, as a matter of law, extreme and outrageous conduct that would give rise to an intentional infliction of emotional distress cause of action. *See, e.g., Ugalde v. W.A. McKenzie Asphalt Co.,* 990 *F.*2d 239, 243 (5th Cir.1993) (holding a supervisor repeatedly uttering epithets toward a Mexican–American employee was not extreme and outrageous conduct and thus not intentional infliction of emotional distress); *Lay v. Roux Lab., Inc.,* 379 *So.*2d 451, 452 (Fla.App.1980) (holding a supervisor threatening to terminate a subordinate and uttering racial epithets was not sufficiently outrageous or atrocious to state an intentional infliction of emotional distress claim). In *Bradshaw v. Swagerty,* 1 *Kan.App.*2d 213, 563 *P.*2d 511, 514 (1977), the court determined that "the trial court was fully justified in regarding the [racial] epithets complained of here as 'mere insults' of the kind which must be tolerated in our roughedged society." We disagree. In this day and age, in this society and culture, and in this State, an ugly, vicious racial slur uttered by a high-ranking public official, who should know better and is required to do better, cannot, in light of this State's strong and steadfast public policy against invidious discrimination, be viewed as a picayune insult. That view would be blind and impervious to the lessons of history.

> [R]acial insults are in no way comparable to statements such as, "You are a God damned woman and a God damned liar," which the Restatement gives as an example of a "mere insult." Racial insults are different qualitatively because they conjure up the entire history of racial discrimination in this country.
>
> [Richard Delgado, *Words that Wound: A Tort Action for Racial Insults, Epithets, and Name–Calling,* 17 *Harv. C.R.-C.L. L.Rev.* 133, 157 (1982).]

"The term 'nigger' is one of insult, abuse and belittlement harking back to slavery days." *Bradshaw, supra,* 563 *P.*2d at 514. The

term "jungle bunny" is similarly disparaging. "Racial insults, relying as they do on the unalterable fact of the victim's race and on the history of slavery and race discrimination in this country, have an even greater potential for harm than other insults." Delgado, *supra*, 17 *Harv. C.R.–C.L. L.Rev.* at 143; *see also Karins v. City of Atlantic City*, 152 *N.J.* 532, 562–63, 706 *A.2d* 706, 721 (1998) (recognizing that certain words, in the context of history, carry a message of "hatred, persecution, and degradation of certain groups" (internal quotations omitted)); Kent Greenawalt, *Insults and Epithets: Are They Protected Speech?*, 42 *Rutgers L.Rev.* 287, 291–92 (1990) ("The significance of group epithets is ... they call to mind whatever 'negative' qualities are associated with a group, qualities such as laziness, greed, dishonesty, stupidity, vulgarity.").[2]

We do not hold that a single racial slur spoken by a stranger on the street could amount to extreme and outrageous conduct. But, a jury could reasonably conclude that the power dynamics of the workplace contribute to the extremity and the outrageousness of defendant's conduct. "[T]he employer-employee relationship has been regarded as a special relationship which is a factor to be considered in determining whether liability should be imposed." J.D. Lee & Barry A. Lindahl, 3 *Modern Tort Law: Liability and*

---

[2] Even if we assume that a supervisor's racist slurs directed toward his subordinates would not have been deemed intolerable one or two generations ago, defendant's behavior is not acceptable today. *See Alcorn v. Anbro Eng'g, Inc.*, 2 *Cal.*3d 493, 86 *Cal.Rptr.* 88, 91 n. 4, 468 *P.2d* 216, 219 n. 4 (1970) ("Although the slang epithet 'nigger' may once have been in common usage, ... [it] has become particularly abusive and insulting in light of recent developments."); *Contreras v. Crown Zellerbach Corp.*, 88 *Wash.*2d 735, 565 *P.2d* 1173, 1177 (1977) ("As we as a nation of immigrants become more aware of the need for pride in our diverse backgrounds, racial epithets which were once part of common usage may not now be looked upon as 'merely insulting language.' Changing sensitivity in society alters the acceptability of former terms."). The common law must adapt to this modern circumstance. *See Hopkins v. Fox & Lazo Realtors*, 132 *N.J.* 426, 435, 625 *A.2d* 1110 (1993) ("We have long acknowledged that the legal rules expressive of the common law embody underlying principles of public policy and perceptions of social values. Because public policy and social values evolve over time, so does the common law.").

*Litigation* § 32.03, at 133–34 (rev. ed.1990); *accord* Stuart M. Speiser et al., 4 *The American Law of Torts* § 16.21, at 1094 (1987) ("Courts in quite a few states have considered the employer-employee relationship a significant factor in determining whether liability for the tort of infliction of intentional or reckless emotional distress."); *see Alcorn v. Anbro Eng'g, Inc.,* 2 *Cal.*3d 493, 86 *Cal.Rptr.* 88, 91 n. 2, 468 *P.*2d 216, 218 n. 2 (1970) (holding employees are entitled to greater protection from insults than strangers); *White v. Monsanto Co.,* 585 *So.*2d 1205, 1210 (La.1991) ("A plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger."); *Harris v. Jones,* 281 *Md.* 560, 380 *A.*2d 611, 615–16 (1977) (holding employers have a higher duty than strangers to avoid inflicting emotional distress); *Hall v. May Dep't Stores Co.,* 292 *Or.* 131, 637 *P.*2d 126, 131 (1981) (same); *cf. M.B.M. Co. v. Counce,* 268 *Ark.* 269, 596 *S.W.*2d 681, 688 (1980) ("[T]here are cases in which the extreme and outrageous nature of the conduct arises not so much from what is done as from the abuse by the defendant of a relationship with the plaintiff which gives him power to damage the plaintiff's interests."). "When one in a position of authority ... over another has allegedly made [a] racial slur[ ] ..., this abusive conduct gives added impetus to the claim of outrageous behavior." *Contreras v. Crown Zellerbach,* 88 *Wash.*2d 735, 565 *P.*2d 1173, 1176 (1977). As the Sheriff of Burlington County, defendant was not merely plaintiff's superior—he was the chief executive of her office and the second highest-ranking law enforcement official in the county. "Defendant occupied a position of authority and power over plaintiff.... [D]efendant's abuse of this relationship ... support[s] a finding of extreme and outrageous conduct." *Wilson v. Kiss,* 751 *F.Supp.* 1249, 1255 (E.D.Mich.1990).

Therefore, the fact that defendant uttered only one slur toward plaintiff does not, as a matter of law, preclude his conduct from being extreme and outrageous. "A single event, under the right circumstances, may be extreme and outrageous."

*Id.* at 1254. Defendant's conduct in this case may present those unusual circumstances. In the presence of Undersheriff Isham, defendant, the Sheriff of Burlington County, referred to plaintiff, who had been a sheriff's officer for twenty years, as a "jungle bunny." In light of the potency of racial slurs and defendant's authority as sheriff, a jury could reasonably determine that defendant's conduct was extreme and outrageous.

Nevertheless, defendant made only one racial slur and claims he did not comprehend its opprobrious connotation. Notably, defendant did not unleash a barrage of epithets toward plaintiff. He did not repeat the slur. Despite his initial reluctance, defendant apologized for his remark. He never threatened her with reprisals or dismissal from her job as a sheriff's officer. Plaintiff never lost income, and her basic job duties did not change. Although she lost her position as floor supervisor, it may in fact have been true that only sergeants were eligible for that position. Based on those facts, a jury could reasonably conclude that defendant's conduct was neither extreme nor outrageous. But, that is not the only conclusion a rational factfinder could reach. Because an issue of material fact exists regarding the extremity of defendant's conduct, defendant is not entitled to summary judgment.

■ Besides establishing that defendant's conduct was outrageous, "plaintiff must prove that the defendant acted intentionally or recklessly ... both to do the act and to produce emotional distress." *Buckley, supra,* 111 *N.J.* at 366, 544 *A.*2d 857. Undoubtedly, defendant intended to say what he did in fact say: "There's the jungle bunny." Furthermore, defendant's intent to cause emotional distress can be inferred from his remark. "There can be little doubt that the dignitary affront of racial insults ... is intentional and therefore most reprehensible." Delgado, *supra,* 17 *Harv. C.R.–C.L. L.Rev.* at 145. Although defendant insists he was unaware that "jungle bunny" is a slur, a rational factfinder is free to reject that contention. *See ibid.* ("Most people know today that certain words are offensive and only calculated to wound."); *Lathrope–Olson v. Oregon Dep't of Trans.,* 128 *Or.App.* 405, 876

*P.*2d 345, 347 (1994) ("Such overt acts of [racial harassment] . . . are not simply rude and boorish, but are more properly characterized as the kind of conduct that a jury could find was intended to inflict deep, stigmatizing and psychic wounds on another person.").

Nonetheless, the fact that most people understand that "jungle bunny" is a racial slur does not conclusively prove that defendant appreciated the term's meaning. After listening to defendant's testimony, a jury could reasonably conclude that defendant's contention is credible and sincere. Accordingly, a jury may find that defendant did not intend to cause, or recklessly disregard the risk that his remark would cause, plaintiff to suffer severe emotional distress. Because defendant's intent is a disputed issue of material fact, summary judgment on that issue is inappropriate.

A cause of action for intentional infliction of emotional distress also requires that "the emotional distress suffered by the plaintiff must be 'so severe that no reasonable [person] could be expected to endure it.'" *Buckley, supra,* 111 *N.J.* at 366, 544 *A.*2d 857 (quoting *Restatement, supra,* § 46 cmt. j). In this case, plaintiff's evidence indicated that she may have suffered severe emotional distress as a result of defendant's conduct. For as long as she could afford to do so, plaintiff regularly underwent psychotherapy from Dr. Fox. She lived in fear that propelled her to purchase a bullet-proof vest. She was treated for anxiety. She suffered from mood changes and insomnia and experienced nightmares and flashbacks of the incident, symptoms that persisted for over two years after defendant's remark. Dr. Fox ultimately diagnosed her as suffering post-traumatic stress disorder.

Plaintiff's purported emotional distress differs from that alleged by the unsuccessful plaintiffs in *Buckley, supra,* and *Decker v. Princeton Packet, Inc.,* 116 *N.J.* 418, 430, 561 *A.*2d 1122 (1989). In *Buckley,* the plaintiff's "complaints amount[ed] to nothing more than aggravation, embarrassment, an unspecified number of headaches, and loss of sleep." 111 *N.J.* at 368, 544 *A.*2d 857. In *Decker,* the plaintiff's emotional harm was similar to that suffered by the plaintiff in *Buckley.* 116 *N.J.* at 431, 561 *A.*2d 1122. In

both cases, the injury was "not sufficiently palpable, severe, or enduring." *Ibid.* In contrast to Taylor, neither plaintiff sought medical treatment for their emotional anguish or claimed to suffer harm that was both severe and enduring.

"Severe emotional distress means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so, including ... posttraumatic stress disorder." *Poole v. Copland, Inc.,* 125 *N.C.App.* 235, 481 *S.E.*2d 88, 93 (1997) (internal quotations omitted); *accord Schnabel v. Tyler,* 32 *Conn.App.* 704, 630 *A.*2d 1361, 1368–69 (1993) (upholding intentional infliction of emotional distress award for plaintiff with post-traumatic stress disorder), *aff'd,* 230 *Conn.* 735, 646 *A.*2d 152 (1994); *Curtis v. Firth,* 123 *Idaho* 598, 850 *P.*2d 749, 756–57 (1993) (same); *Kraszewski v. Baptist Medical Ctr. of Okla., Inc.,* 916 *P.*2d 241, 249 (Okla.1996) (finding post-traumatic stress disorder to be severe emotional distress). Dr. Fox's diagnosis that plaintiff suffered post-traumatic stress disorder permits a rational factfinder to conclude that she suffered severe emotional distress. On the other hand, a jury would be free to reject plaintiff's psychiatric evidence and conclude that she did not suffer severe emotional distress.

Further, Taylor has submitted evidence supporting the contention that "the defendant's actions [were] the proximate cause of the plaintiff's emotional distress." *Buckley, supra,* 111 *N.J.* at 366, 544 *A.*2d 857. Dr. Fox determined that plaintiff's post-traumatic stress disorder was caused by defendant calling her a "jungle bunny." [3] Once again, after reviewing the evidence, a jury may conclude otherwise.

---

[3] We do not agree with the implications of the Appellate Division's observation that plaintiff's alleged emotional injury should be discounted because "[m]uch of plaintiff's claimed emotional distress stemmed from her decision to republish the offensive remark to others outside the grievance procedure in which she had a course of redress." Plaintiff did not have an obvious or ready course of redress in view of defendant's status as her supervisor. Further, defendant was a public official serving in an important public office. His conduct in that office allegedly

In addition, in order to constitute actionable intentional infliction of emotional distress, defendant's conduct must be sufficiently severe to "cause genuine and substantial emotional distress or mental harm to average persons." *Decker,* 116 *N.J.* at 430, 561 *A.*2d 1122. Accordingly, people cannot recover for idiosyncratic emotional distress that would not be experienced by average persons. *See Williamson v. Waldman,* 150 *N.J.* 232, 250, 696 *A.*2d 14 (1997) (denying damages for emotional distress reasonable people would not experience). This objective standard ensures that defendants are not held liable when hypersensitive plaintiffs suffer severe emotional trauma from conduct that would not seriously wound most people. *See Buckley, supra,* 111 *N.J.* at 367, 544 *A.*2d 857 ("By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims while eliminating those that should not be compensable.").

But, in order to evaluate fairly whether plaintiff's emotional distress was idiosyncratic, the average person must be one similarly situated to the plaintiff. *See Savage v. Old Bridge–Sayreville Medical Group, P.A.,* 134 *N.J.* 241, 250, 633 *A.*2d 514 (1993) (using "reasonable person in plaintiff's position" standard in medical malpractice case (internal quotations omitted)); *Berrie v. Toyota Motor Sales USA, Inc.,* 267 *N.J.Super.* 152, 157, 630 *A.*2d 1180 (App.Div.1993) (using "reasonable person in plaintiff's position" standard in Lemon Law case); *Flowers v. Bank of Am. Nat. Trust & Sav. Ass'n,* 67 *Or.App.* 791, 679 *P.*2d 1385, 1387 (1984) (using "reasonable person in plaintiff's position" standard to evaluate an intentional infliction of emotional distress claim). Whenever an intentional infliction of emotional distress claim arises out of conduct that also constitutes invidious discrimination on the basis

---

in violation of the powerful anti-discrimination policies of this State and the LAD is indisputably a matter of public concern and one that can be shared with the public. In these circumstances, plaintiff had a right to disclose the incident to the public, and her exercise of that choice should not derogate from her claim that she suffered severe emotional injury as a result of defendant's actions.

of "race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, [military service], or nationality," *N.J.S.A.* 10:5–3, the average person standard must be adapted to reflect those characteristics of the plaintiff that are the focus of the alleged discrimination. Thus when, as here, a black plaintiff asserts an intentional infliction of emotional distress claim based on the harm caused by racial epithets, the inquiry becomes whether the average African American would suffer severe emotional distress under the circumstances.

This average African American standard is analogous to the reasonable African American standard used in the analysis and assessment of plaintiff's LAD claim. *See supra* at 498–99, 706 *A.*2d at 689; *id.* at 506–07, 706 *A.*2d at 693. In *Lehmann, supra,* 132 *N.J.* at 614–15, 626 *A.*2d 445, this Court explained why we employ a reasonable woman standard for a sexual harassment LAD claim. First, the reasonable person standard tends to be male-biased because our society and our courts tend to view the male perspective as the objective one. *Id.* at 614, 626 *A.*2d 445. Second, in most sectors of the workforce women are a minority whose position at the workplace is often marginal; consequently, sexual harassment can "undermine [a] woman's self-confidence and interfere with her ability to be perceived by others as a capable worker with the potential to advance and succeed." *Id.* at 615, 626 *A.*2d 445.

Those reasons apply with equal force to plaintiff's intentional infliction of emotional distress claim, which arises from her allegations of racial harassment. African Americans may respond differently to racial slurs than white people. *See* Matsuda, *supra,* 87 *Mich. L.Rev.* at 2327 ("The typical reaction of target-group members to an incident of [racial harassment] is alarm and immediate calls for redress. The typical reaction of non-target-group members is to consider the incidents isolated pranks, the product of sick-but-harmless minds."); Lawrence, *supra,* 1990 *Duke L.J.* at 435 ("We [African Americans] often hear racist speech when our

white neighbors are not aware of its presence."). Furthermore, because blacks, like women, represent a minority in most sectors of the workforce, many African Americans may feel that they have a precarious position at the workplace that renders them especially vulnerable to emotional distress in response to being victimized by racial slurs at work.

Thus, different racial groups can react disparately to racial slurs. *See Alcorn, supra,* 86 *Cal.Rptr.* at 91 n. 3, 468 *P.*2d at 218 n. 3 (recognizing that blacks are particularly susceptible to severe emotional distress from discriminatory conduct); *Contreras, supra,* 565 *P.*2d at 1177 (stating that a Mexican American, by reason of his national origin and ethnicity, was particularly susceptible to emotional distress caused by invidious slurs). Due to this distinction, we hold that in an intentional infliction of emotional distress claim arising out of an allegation of racial harassment, the plaintiff's race must shape the objective inquiry into the severity of the distress.

Accordingly, we must decide whether, as a matter of law, the average African American could have suffered emotional distress as a result of defendant's remark. We determine that a rational factfinder may find that defendant's conduct would have caused severe emotional distress in the average African American. At the time of the incident, plaintiff was a sheriff's officer for Burlington County for twenty years. She was a loyal employee who performed satisfactorily. As an African American, she was a minority in her place of employment. She had experienced no prejudice-related problems at work until defendant's remark. When defendant called her a "jungle bunny," she learned what defendant, the Sheriff of Burlington County, apparently thought of her. He did not perceive her *as a capable and loyal sheriff's officer;* instead, in his eyes she was nothing more than a "jungle bunny." A jury could reasonably find that defendant's conduct would have a devastating effect on the average African American.

Racial slurs, especially when used by an employee's superior at the workplace, can wound.

> Immediate mental or emotional distress is the most obvious direct harm caused by a racial insult. Without question, mere words, whether racial or otherwise, can cause mental, emotional, or even physical harm to their target, especially if delivered in front of others or by a person in a position of authority.
>
>   *   *   *   *   *   *   *   *
>
> In addition to the harms of immediate emotional distress and infringement of dignity, racial insults inflict psychological harm upon the victim. Racial slurs may cause long-term emotional pain because they draw upon and intensify the effects of the stigmatization, labeling, and disrespectful treatment that the victim has previously undergone.
>
> [Delgado, *supra*, 17 *Harv. C.R.–C.L. L.Rev.* at 143, 146.]

*See also* Matsuda, *supra*, 87 *Mich. L.Rev.* at 2336–40 (discussing the harms caused by racist expression); *cf.* Patricia Williams, *Spirit–Murdering the Messenger: The Discourse of Fingerpointing as the Law's Response to Racism*, 42 *U. Miami L.Rev.* 127, 129 (1987) (describing racism as "spirit-murder"). A study conducted by the National Institute Against Prejudice and Violence and The Prejudice Institute/Center for the Applied Study of Ethnoviolence concluded that, in society at large and in the working environment, harassment causes more psychic harm when motivated by race, ethnicity, gender, religion, or sexual orientation than when not similarly motivated. Howard J. Ehrlich et al., *The Traumatic Impact of Ethnoviolence, in The Price We Pay: The Case Against Racist Speech, Hate Propaganda, and Pornography* 63–76 (Laura J. Lederer & Richard Delgado eds.1995). Accordingly, a rational factfinder may conclude that defendant's sole remark would have caused substantial emotional distress in the average African American.

■ However, a jury may also reasonably conclude that the average African American would not have suffered severe emotional distress as a result of defendant's conduct. Although racial epithets harm the people at whom they are directed, defendant uttered only one slur, for which he ultimately apologized. Defendant never placed plaintiff's job in jeopardy. Consequently, even if it concludes that plaintiff suffered post-traumatic stress disorder, a jury may reasonably determine that her reaction was atypical. If a jury finds that the average African American would

not have suffered severe emotional distress, then plaintiff's emotional trauma would be considered to be an idiosyncratic reaction for which she cannot recover in tort. Due to the factual dispute regarding whether defendant's remark would cause the average African American to suffer severe emotional distress, defendant is not entitled to summary judgment.

Therefore, we determine that plaintiff has presented sufficient evidence to withstand summary judgment on her intentional infliction of emotional distress claim. *See Howard University v. Best*, 484 A.2d 958, 986 (D.C.1984) ("Creation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress."). Other jurisdictions have made similar determinations. *Robinson v. Hewlett–Packard Corp.*, 183 *Cal. App.*3d 1108, 228 *Cal.Rptr.* 591, 604–05 (1986) (holding that evidence of a supervisor insulting the plaintiff's race and causing him to suffer emotional distress sufficed to preclude summary judgment for defendant on an intentional infliction of emotional distress claim); *Gomez v. Hug*, 7 *Kan.App.*2d 603, 645 *P.*2d 916, 922 (1982) (holding that evidence of a county commissioner repeatedly using a slur against a Mexican–American employee presented issues of material fact concerning whether the commissioner intentionally inflicted emotional distress); *Ledsinger v. Burmeister*, 114 *Mich.App.* 12, 318 *N.W.*2d 558, 562 (1982) (holding that evidence of a merchant using a racial slur as he was ejecting plaintiff from a store sufficed to state an intentional infliction of emotional distress cause of action).

Moreover, several other courts have held that allegations that racial epithets were uttered is sufficient to maintain an action for intentional infliction of emotional distress. *See Oliver v. Cuttler*, 968 *F.Supp.* 83, 93 (E.D.N.Y.1997) (holding that a plaintiff presents a colorable claim of intentional infliction of emotional distress where she alleges that a police officer uttered racial slurs); *Martin v. Ezeagu*, 816 *F.Supp.* 20, 26 (D.D.C.1993) (concluding a prison librarian's use of racial slurs and banishment of an inmate

from the library states an intentional infliction of emotional distress claim); *Mass v. Martin Marietta Corp.*, 805 *F.Supp.* 1530, 1543–44 (D.Colo.1992) (stating a jury could find a supervisor's racial slurs and co-workers' racial jokes to be intentional infliction of emotional distress); *Price v. Philadelphia Elec. Co.*, 790 *F.Supp.* 97, 100 (E.D.Pa.1992) (holding allegations of racial slurs by co-workers is sufficient to state a claim of intentional infliction of emotional distress); *Brown v. Manning*, 764 *F.Supp.* 183, 187–88 (M.D.Ga.1991) (denying summary judgment for defendant on intentional infliction of emotional distress claim arising out of an insurance adjuster's vulgar telephone call laced with racial slurs); *Agarwal v. Johnson*, 25 *Cal.*3d 932, 160 *Cal.Rptr.* 141, 149, 603 *P.*2d 58, 67 (1979) (upholding jury verdict that using racial epithet and recommending termination of plaintiff's employment constituted intentional infliction of emotional distress); *Alcorn, supra,* 86 *Cal.Rptr.* at 90–91, 468 *P.*2d at 218–19 (denying summary judgment for defendant on intentional infliction of emotional distress claim based on the utterance of racial slurs and termination of plaintiff's employment); *Mauri v. Smith*, 135 *Or.App.* 662, 901 *P.*2d 247, 254–55 (1995) (upholding jury verdict for plaintiffs' intentional infliction of emotional distress claim where an apartment complex employee used racial slurs when attempting to enter plaintiffs' apartment), *rev'd on other grounds*, 324 *Or.* 476, 929 *P.*2d 307 (1996); *Contreras, supra,* 565 *P.*2d at 1177 (holding invidious slurs against a Mexican American may constitute intentional infliction of emotional distress).

We conclude that plaintiff's proffered evidence is sufficient to support her allegations and to posit a claim based on the intentional infliction of emotional injury and fairly raises disputed issues of material facts that should be resolved by a jury. Accordingly, we reverse summary judgment in favor of defendant on plaintiff's intentional infliction of emotional distress cause of action.[4]

---

[4] As noted earlier, *supra* at 509–10, 706 *A.*2d at 694–95, if plaintiff ultimately prevails on both her LAD and intentional infliction of emotional distress claims, she cannot obtain a double recovery. The LAD provides victims of employment

## IV

The Appellate Division upheld the trial court's dismissal of petitioner's prima facie tort claim. We concur in that determination.

"One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability." *Restatement (Second) of Torts* § 870 (1979); *accord Freihofer v. Hearst Corp.*, 65 *N.Y.*2d 135, 490 *N.Y.S.*2d 735, 740, 480 *N.E.*2d 349, 354 (1985).

Several states recognize a prima facie tort cause of action. Kenneth J. Vandevelde, *The Modern Prima Facie Tort Doctrine*, 79 *Ky. L.J.* 519, 525–27 (1990/1991) (declaring twenty-one states, including New Jersey, plus the Virgin Islands and District of Columbia recognize prima facie tort); James P. Bieg, *Prima Facie Tort Comes to New Mexico: A Summary of Prima Facie Tort Law*, 21 *N.M. L.Rev.* 327, 343–47 (1991) (declaring eleven states, including New Jersey, recognize prima facie tort). Some jurisdictions that recognize a prima facie tort limit its applicability to instances in which a plaintiff would have no other cause of action. Vandevelde, *supra*, 79 *Ky. L.J.* at 537; Bieg, *supra*, 21 *N.M. L.Rev.* at 353–57, 361–62.

One Appellate Division case has recognized the existence of a prima facie tort cause of action. *See Trautwein v. Harbourt*, 40 *N.J.Super.* 247, 266, 123 *A.*2d 30 (App.Div.) ("We have no difficulty with the theoretical concept . . . that intentional, willful or malicious harms of any kind are actionable unless justified."), *certif. denied*, 22 *N.J.* 220, 125 *A.*2d 233 (1956). Nevertheless, we

discrimination with a full panoply of damages, including recovery for emotional distress caused by discriminatory acts. *See N.J.S.A.* 10:5–3. Thus, while plaintiff's intentional infliction of emotional distress claim provides her with another legal theory of recovery, this cause of action does not permit plaintiff to be overcompensated for the harm she alleges defendant caused her.

decline in this case to recognize a claim in prima facie tort. A prima facie tort cause of action would encompass the "intentional, willful and malicious harms" that fall within the gaps of the law. *Ibid.* Prima facie tort claims have been most frequently permitted only in the limited situations in which plaintiffs would have no other causes of action. *See* Vandevelde, *supra,* 79 *Ky. L.J.* at 537 (observing prima facie tort is typically a "tort of last resort" (internal quotations omitted)).

The LAD prohibits racial harassment in the workplace and, in this case, forbids the conduct of defendant that allegedly gives rise to the prima facie tort claim. Moreover, the tort of intentional infliction of emotional distress encompasses the conduct that in these circumstances would be targeted by a claim based on prima facie tort. Even if allegations of racial harassment were insufficient to state an LAD claim or a claim of intentional infliction of emotional distress, a prima facie tort cause of action should not be used to overcome those deficiencies. Prima facie tort should not be invoked when the essential elements of an established and relevant cause of action are missing. *Yeitrakis v. Schering–Plough Corp.,* 804 *F.Supp.* 238, 250–51 (D.N.M.1992) (rejecting a prima facie tort claim for a bad-cause termination of an at-will employee). "Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs." *Belsky v. Lowenthal,* 62 *A.D.*2d 319, 322, 405 *N.Y.S.2d* 62, 65 (1978), *aff'd,* 47 *N.Y.*2d 820, 418 *N.Y.S.*2d 573, 392 *N.E.*2d 560 (1979).

The trial court properly dismissed the prima facie tort claim. Consequently, this case presents no opportunity for this Court to determine the applicability of a cause of action for prima facie tort.

V

The judgment of the Appellate Division is reversed in part and the case remanded for trial in accordance with this opinion.

GARIBALDI, J., dissenting in part, concurring in part.

This appeal presents the primary issue of whether a single racial slur created a hostile work environment in violation of the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –42. It also presents the issue of whether a single racial slur can support claims for intentional infliction of emotional distress and for *prima facie* tort. The trial court dismissed all of plaintiff's claims. The Appellate Division affirmed the dismissal. The majority here reversed the dismissal of plaintiff's LAD claim and claim for emotional distress, but affirmed the dismissal of plaintiff's *prima facie* tort claim. I would affirm the Appellate Division and dismiss all of plaintiff's claims.

I

## *LAD CLAIM*

I agree with the majority that the standards established in *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993), apply to racial discrimination cases, that a single incident of racial harassment may be severe enough to produce a hostile work environment, and that the fact the single remark here was made by the Sheriff is a factor to be considered. However, I believe, as did the trial court and the Appellate Division, that "despite the defendant's deplorable use of a racial slur, 'the workplace, objectively viewed, [was] not hostile.'"

Although a single incident of racial harassment can result in a hostile work environment, "it will be a rare and extreme case in which a single incident will be so severe that it would ... make the working environment hostile." *Lehmann, supra,* 132 *N.J.* at 606–07, 626 *A.*2d 445. As the majority properly recognizes, "usually repeated racial slurs must form the basis for finding that a hostile work environment has been created." *Ante* at 500, 706 *A.*2d at 690 (citations omitted); *see also Ellison v. Brady,* 924 *F.*2d 872 (9th Cir.1991) ("Although a single act can be enough, ... generally repeated incidents create a stronger claim of hostile

environment, with the strength of the claim depending on the number of incidents and the intensity of each incident.") (quoting *King v. Board of Regents*, 898 *F*.2d 533, 537 (7th Cir.1990)).

It is the "harasser's conduct, not the plaintiff's injury, that must be severe or pervasive." *Lehmann, supra*, 132 *N.J.* at 610, 626 *A*.2d 445. Because the Sheriff, plaintiff's supervisor, made the remark, its severity is exacerbated. Nonetheless, while the Sheriff's remark was extremely offensive, demeaning and humiliating, he used the racial epithet only once. Moreover, although he was reluctant to apologize, the Sheriff promptly offered a written apology that plaintiff refused. Furthermore, plaintiff, who has worked in the Sheriff's office since 1972, never alleged any other incident of discrimination by the Sheriff or by any other member of the Sheriff's office. Indeed, plaintiff received commendations from the Sheriff for her work.

As the Appellate Division properly concluded, plaintiff experienced no adverse consequences in the terms of her employment. There was no change in plaintiff's employment status. Her working conditions were not altered. There was no interference with her work performance. She remained a sheriff's officer, continued her assigned duties, and lost no time from her work. Furthermore, there was no reduction in salary and plaintiff lost no wages as a result of the incident.

The majority attempts to excuse plaintiff's failure to prove a change in her working conditions by changing the *Lehmann* standard and asserting that "[t]he test of severity adopted by this Court in *Lehmann* does not in all cases require evidence of an actual change in working conditions." *Ante* at 505, 706 *A*.2d at 692. I disagree. The majority fails to recognize that "the hostile work environment is the legally recognized harm." *Lehmann, supra*, 132 *N.J.* at 610, 626 *A*.2d 445. Plaintiff has failed to show that her working conditions were affected by the harassment "to the point at which a reasonable woman would consider the working environment hostile." *Ibid.* That she has not proven a change in conditions is not surprising since plaintiff's major contention is

that, in a racial discrimination case under LAD, it is not necessary to establish a hostile work environment. Hence, she has presented little evidence of such an environment. In her complaint, plaintiff merely alleges that she "suffered an emotional insult to her sense of well-being."

By holding that a single racial slur that does not result in any "actual change in working conditions," *ante* at 505, 706 *A*.2d at 692, is severe enough to create a hostile work environment resulting in a LAD violation, the Court has substantially changed the *Lehmann* standard and enlarged the scope of LAD. It also reflects a departure from the United States Supreme Court's treatment of single racial slurs. The Supreme Court has observed that under Title VII, a single racial epithet, although extremely offensive to an employee, does not affect the terms, conditions or privileges of employment. *Meritor Sav. Bank v. Vinson,* 477 *U.S.* 57, 67, 106 *S.Ct.* 2399, 2405, 91 *L.Ed.*2d 49, 60 (1986) ('mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree [so as] to violate Title VII)) (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)); *see also Henson v. City of Dundee,* 682 *F.*2d 897, 904 (11th Cir.1982) (quoting same).

The majority also adopts a different view of a single racial slur than is found in the law of defamation. Recognizing the "chilling effect such a holding would cast over a person's freedom of expression," most courts do not find words of "bigotry or racism to constitute actionable defamation, thus protecting the freedom to express even unpopular, ugly and hateful, political, religious, and social opinions." *Ward v. Zelikovsky,* 136 *N.J.* 516, 533, 536, 643 *A.*2d 972 (1994). Although the Sheriff's remark was morally repugnant and reprehensible, I believe that it was not severe enough to result in a LAD violation. The Court has come perilously close to punishing the Sheriff not for creating a hostile work environment under LAD, but solely for his speech.

I conclude that the record fails to support the majority's conclusion that the Sheriff's single remark was severe enough to constitute a LAD violation. I would affirm the order of summary judgment for defendant on the LAD claim.

## II

### *Infliction of Emotional Distress*

In order to state a cause of action for intentional infliction of emotional distress, "plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Sav. Fund Soc'y,* 111 *N.J.* 355, 366, 544 *A.*2d 857 (1988). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Ibid.* (quoting *Restatement (Second) of Torts,* § 46 comment d).

Even if plaintiff's LAD claim were established, not every instance of discriminatory harassment in the workplace rises to the level of intentional infliction of emotional distress. In a LAD claim, "[t]he plaintiff's injury need be no more tangible or serious than the conditions of employment have been altered and the work environment has become abusive." *Lehmann, supra,* 132 *N.J.* at 610, 626 *A.*2d 445. Generally, however, that kind of injury will not be sufficient to meet the level of harm required for the tort of intentional infliction of emotional distress.

As the majority recognizes, most jurisdictions have held that a supervisor's uttering racial slurs toward his subordinates is not extreme and outrageous conduct that would give rise to an intentional infliction of emotional distress cause of action. *See, e.g., Ugalde v. W.A. McKenzie Asphalt Co.,* 990 *F.*2d 239, 243 (5th Cir.1993) (holding supervisor's repeatedly uttering epithets toward Mexican–American employee was not extreme and outrageous conduct and thus not intentional infliction of emotional distress); *Lay v. Roux Lab.,* 379 *So.*2d 451, 452 (Fla.App.1980) (finding

supervisor's threatening to terminate subordinate and uttering racial epithets was not sufficiently outrageous or atrocious to state intentional infliction of emotional distress claim); *Bradshaw v. Swagerty*, 1 *Kan.App.*2d 213, 563 *P.*2d 511, 514 (1977) ("[T]he trial court was fully justified in regarding the [racial] epithets complained of here as 'mere insults' of the kind which must be tolerated in our roughedged society."); *Ante* at 510, 706 *A.*2d at 694. Indeed, the majority fails to cite a single case that holds that a single racial slur is severe enough to support a claim of intentional infliction of emotional distress.

Courts also have held that other forms of racial and religious harassment are not sufficient to support a claim for intentional infliction of emotional distress. *See Vance v. Southern Bell Tel. and Tel. Co.*, 983 *F.*2d 1573, 1575 n. 7 (11th Cir.1993) (holding racial harassment was not intentional infliction of emotional distress); *Bouie v. Autozone, Inc.*, 959 *F.*2d 875, 877–78 (10th Cir. 1992) (holding supervisor's repeated use of racial slurs outside the plaintiff's presence was not intentional infliction of emotional distress); *McCray v. DPC Indus., Inc.*, 875 *F.Supp.* 384, 391–92 (E.D.Tex.1995) (holding racial harassment was not intentional infliction of emotional distress); *Vaughn v. Ag Processing Inc.*, 459 *N.W.*2d 627, 636 (Iowa 1990) (holding religious harassment was not intentional infliction of emotional distress).

> Certainly, the use of any religious, ethnic or racial slur must be strongly disapproved and condemned. However, the fact that we view the alleged conduct as being deplorable and reprehensible does not necessarily lead to the conclusion that it arose to such a level that the law must provide a remedy.
>
> [*Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 *A.D.*2d 169, 548 *N.Y.S.2d* 513, 521 (1989).]

Whether defendant's conduct occurs at the workplace or on the street, plaintiff must prove not only that she subjectively suffered severe emotional distress, *Buckley, supra*, 111 *N.J.* at 366, 544 *A.*2d 857, but that an average African American would suffer *severe* emotional distress. *Decker v. Princeton Packet*, 116 *N.J.* 418, 430, 561 *A.*2d 1122 (1989). The Court in *Buckley, supra*, stated that "[t]he severity of the emotional distress raises ques-

tions of both law and fact," and it is the trial judge who "decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." 111 *N.J.* at 367, 544 *A.2d* 857.

Even assuming that the Sheriff's conduct was sufficient to constitute a violation of LAD, his conduct was not sufficiently outrageous to cause the average person to experience severe emotional distress. Being the target of a racial epithet would cause mental anguish and emotional turmoil, including nervousness and sleep loss, in the average person. However, to recover for intentional infliction of emotional distress, as opposed to hostile work environment discrimination, plaintiff must suffer more than aggravation, embarrassment, sleep loss, headaches, and nervous tension. *Buckley, supra,* 111 *N.J.* at 368, 544 *A.2d* 857. I conclude in the circumstances of this case that a single racial epithet, though uttered by a superior, would not cause severe emotional distress in an African American of ordinary experience and normal constitution, sensitivity and susceptibilities.

Plaintiff's evidence supports that conclusion. Plaintiff described her distress at her deposition. Although the evidence was clear that she had never been physically threatened by the Sheriff or anyone from the Sheriff's office, in response to the question of why she was going to a psychiatrist, she replied:

A. Because of what I was going through.

Q. What were you going through:

A. I was nervous all the time, scared, I was scared to go anywhere by myself and frightened to walk out from the job alone, and I was just a nervous wreck.

Similarly, those were the kinds of complaints she reported to Dr. Ira L. Fox, the psychiatrist she had seen on a periodic basis from May 1992 to March 1993. In Dr. Fox's first report dated June 2, 1992, he reported that plaintiff told him:

I'm scared because I don't know what is next for me. I don't leave home the same time everyday anymore and I don't go home the same way everyday anymore.

Since this began to unfold I've been losing my hair since the problems started.

I'm scared. I'm a nervous wreck. I live alone. She told me that she feels as if she is being watched at work and that she has to watch my P's and Q's. She had to have her phone number changed because of getting hang-ups.

I bought a bullet proof vest.

I'm hyper as I don't know what.

My friends keep telling me to calm down.

I don't want to lose my job.

Dr. Fox concluded as his psychiatric diagnosis: "Adjustment disorder with mixed emotional features directly related to and caused by the recent racial slurs which were reportedly said to her by the Sheriff of Burlington County."

Because the County changed medical plans and Dr. Fox was not approved under the new plan, plaintiff ceased going to him or to any other psychiatrist. In preparation for the case on March 18, 1994, however, Dr. Fox again examined plaintiff. He repeated what she had told him:

She wakes up approximately every hour and it could take up to another hour for her to fall asleep. She gets approximately four hours of broken sleep per night. She is still afraid to go out at night and does not go out alone.

She continues to have many thought intrusions about her current situation. Thoughts about it pop into her head for no apparent reason.

She told me that in the recent past, she saw a TV show in which they were discussing racial slurs and negative words and the terms nigger and jungle bunny were on that list.

If I get a letter about a deposition or anything about this case, I just shake.

She told me that she is no better then she was a year ago and I suggested that she enter therapy via her insurance program if she could not return to my office.

Dr. Fox's psychiatric diagnosis at that time was as follows: "Revised. In view of the length and of her difficulties and intensity, her diagnosis is being revised to Post-traumatic stress disorder, directly related to and caused by the incident to her person when she was reportedly called a jungle bunny by Mr. Metzger."

In *Lingar v. Live–In Companions, Inc.*, 300 *N.J.Super.* 22, 692 *A.*2d 61 (App.Div.1997), the plaintiffs brought an action against a personal case agency and its employees based on an employee's allegedly abandoning of the plaintiff and theft of items from his home. In *Lingar*, the Appellate Division agreed with the trial court that plaintiffs did not show the severity of emotional harm

required to support a cognizable claim. *Id.* at 35, 692 *A.*2d 61 (*citing Trisuzzi v. Tabatchnik,* 285 *N.J.Super.* 15, 26, 666 *A.*2d 543 (App.Div.1995)). The court noted that while both plaintiffs were "acutely upset" by reason of the incident, their emotional distress was not "sufficiently substantial to result in physical illness or serious psychological sequelae." *Id.* at 35, 692 *A.*2d 61 (citations omitted).

Likewise, in the present case, the trial court concluded and the Appellate Division agreed, that plaintiff failed to establish a *prima facie* case of intentional infliction of emotional distress. Plaintiff has failed to establish that her emotional distress was sufficiently substantial to result in physical illness or serious psychological harm. In view of her twenty years of service at the office and the lack of any change in her working conditions, plaintiff's fears of going out at night and being subjected to physical violence are not those an average person would suffer as the result of a single racial slur. Indeed, her complaints disclose a level of distress that was remarkably similar to that suffered by *Buckley supra,* 111 *N.J.* at 368, 544 *A.*2d 857, where plaintiff described his distress: "I lost sleep. I was aggravated. I was embarrassed. I developed headaches, and I suffered nervous tension...."

By allowing plaintiff's claim for intentional infliction of emotional distress, the Court has substantially expanded the scope of that tort. The evidence clearly does not establish that plaintiff's emotional distress was severe under the *Buckley* standard or that it was reasonable. I am reluctant to permit recovery of damages for infliction of emotional distress in the absence of severe emotional distress. No court has allowed such a claim for the emotional distress caused by a single racial slur—even one made by an employee's supervisor. I find that the trial court properly granted defendant's motion for summary judgment on the emotional distress claim.

III

In this case, the majority has substantially increased the scope of the hostile work environment claim by allowing plaintiff to

recover for a single racial slur that resulted in no actual change in working conditions and by allowing a claim for emotional distress even though the distress was not substantial. The Court has significantly lessened the "severity" of harassment needed to constitute a LAD violation and the "severity" of emotional distress needed to constitute a claim of emotional distress. There is no legislative mandate requiring such changes. Most importantly, in so holding, the majority has violated our holdings in *Lehmann* and in *Buckley*.

I concur in the Court's dismissal of the *prima facie* tort. I would affirm the judgment of the Appellate Division.

*For reversal in part and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—6.

*Concur in part; dissent in part*—Justice GARIBALDI—1.