**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0590-17T1

IN THE MATTER OF VICTOR
BERMUDEZ, CUMBERLAND
COUNTY, DEPARTMENT OF
CORRECTIONS.

_____

Submitted April 3, 2019 – Decided May 2, 2019

Before Judges Vernoia and Moynihan.

On appeal from the New Jersey Civil Service Commission, Docket No. 2014-716.

Alterman & Associates, LLC, attorneys for appellant Victor Bermudez (Stuart J. Alterman, of counsel and on the brief; Arthur J. Murray, on the brief).

Theodore E. Baker, Cumberland County Counsel, attorney for respondent County of Cumberland (Melissa D. Strickland, Assistant County Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Victor Bermudez, a corrections officer employed by the Cumberland County Department of Corrections (CCDOC), appeals from an August 22, 2017 final agency decision of the Civil Service Commission adopting an administrative law judge's (ALJ) initial decision sustaining the CCDOC's imposition of a ten-day suspension for violating its harassment policy. Based on our review of the record, we are convinced the Commission's decision is supported by substantial credible evidence and is not otherwise arbitrary, capricious or unreasonable, and affirm.

I.

On January 3, 2013, the CCDOC served Bermudez with a preliminary notice of discipline charging him under N.J.A.C. 4A:2-2.3(a)(12) with "[v]iolation of . . . County Policy 4.11 Harassment in the work place" in connection with a September 7, 2012 altercation Bermudez had with a fellow corrections officer, Gregory Glenn. The preliminary notice recommended a ten-day suspension.

Bermudez appealed the preliminary notice of disciplinary action. The charge was sustained in a departmental hearing, and a final disciplinary notice was issued on September 17, 2013. Bermudez appealed the final notice of disciplinary action to the Commission, arguing that the "decision at the local

A-0590-17T1

level [was] baseless and unjustly harsh." The Commission referred the matter to an ALJ for a hearing.

The evidence presented during the hearing showed that on September 7, 2012, Glenn disclosed to other officers comments Bermudez made about an officer who claimed to have cancer. Glenn reported that Bermudez, who was a delegate for the corrections officers' union and involved in handling employee grievances, said the officer did not really have cancer and liked to avoid work. Glenn also advised the officer who claimed to have cancer that she should request assistance from a union official other than Bermudez because Bermudez did not think she had cancer.

Bermudez became irate when he learned Glenn reported his comments to the other officers. He approached Glenn at the Cumberland County jail and said, "What's wrong with you, you bitch ass nigger?" and "Didn't you take your hormone shots?" Glenn immediately reported the incident to his superiors and completed a written report describing what he characterized as Bermudez's "threatening behavior":

> [A]t 0815 [hours] . . . Bermudez went off on me . . . .
> Bermudez said "Glenn have you took those hormone[]
> shots to get the bitch out of you?" "You bitch ass
> nigger. Why did you tell about what I said." Bermudez
> had made a statement that he believed [the officer
> claiming she had cancer] was faking that she had

cancer. Bermudez kept screaming out in front of [two inmates] and [another officer]. He said "[y]ou bitch ass nigger this isn't the first time you told on me[.]" When Bermudez was screaming all this, he was approaching me with his fists ball[ed] up. He kept calling me, Officer Glenn[,] a bitch ass nigger and get [the] fuck out of my way. Bermudez scream also ["]don't say another thing to me ever, you bitch ass nigger["] and went storm off[.]

Glenn testified that Bermudez called him a "bitch ass nigga," explained he was upset when he wrote his report and mistakenly wrote "nigger" instead of "nigga," and further explained he distinguished between the two terms and that "nigga" is a "term of endearment." Glenn is an African-American man, and Bermudez describes himself as Puerto Rican with African ancestry.

The written report of the other officer present during the incident states that Bermudez asked Glenn "if he had taken anything for those female hormones of his and that [Glenn] was a bitch ass nigga." The report further notes that Bermudez told Glenn not to speak to him again, and instructed Glenn to "move out of [Bermudez's] way." The officer testified that although she believed there was slight distinction between use of the terms "nigger" and "nigga" and the former term is "a little bit more harsh," she believed Bermudez called Glenn a "bitch ass nigga" in a derogatory manner and that use of either word was inappropriate in the workplace.

4

Bermudez testified that he approached Glenn on the morning of September 7, 2012, and said

> something to the effect of . . . if he took his hormone pills or hormone shot in reference and he . . . asked me what I was talking about. I'm talking about why did he have to tell [the officer who said she had cancer] what it was that I told him, and he told me I shouldn't have told him. I shouldn't have said that. And I said—and I proceeded to say "You didn't have to go and tell her. If you got a problem, you could have told me." And then, he started yelling incoherently, which he gets—he's the type of person that's very emotional and gets very vocal and loud, and I proceeded to call him a "bitch ass nigger" for doing so.

Later in his testimony, Bermudez explained that he used the word "nigga" when speaking with Glenn, and claimed the word "can be used as a term of endearment to friends." Bermudez admitted he "called [Glenn] a 'bitch ass nigga'" because "[Glenn's] voice gets real high" and he was "challenging [Glenn's] manhood, meaning, you know, you're acting like a female, you know . . . gossiping with women." Bermudez further testified he "said something to the effect that [Glenn] had a lot of estrogen in him and that [Glenn] was acting like a female, gossiping with females when, you know, if [Glenn] had a problem" with what Bermudez said about the officer who said she had cancer, Glenn "should have talked man to man about it, not ran to a woman."

A-0590-17T1

Bermudez testified he did not intend to racially insult Glenn, but he did intend to insult Glenn by saying Glenn was acting like a woman.

Following the incident, Glenn called Captain Radames Morales, who testified Glenn was "highly upset" and "said that he was just verbally assaulted by . . . Bermudez." Morales testified Glenn was "very agitated and offended" by the incident. After his conversation with Glenn, Morales documented Glenn's complaint, which was sent to Internal Affairs for an investigation.

Warden Robert Balicki assigned the investigation to Captain Palau. Balicki testified he believed that "people have the right to come to the workplace and not be intimidated and called names and threatened and . . . made to feel uncomfortable at work." He also testified he did not distinguish between the words "nigger" and "nigga," stating he found "both [words] offensive." After Palau's investigation, Balicki determined Bermudez should be disciplined. He used correctional discipline guidelines to impose the ten-day suspension. Glenn testified he reconciled with Bermudez following the incident, and submitted a letter requesting dismissal of the charge against Bermudez, but Balicki denied the request.

The County of Cumberland Prohibited Discrimination and Harassment Policy provides that:

A-0590-17T1

> [D]iscrimination or harassment based on a person's race, creed, color, religion, national origin, ancestry, marital status, affectional or sexual orientation, familial status, sex, age, disability, veteran status, gender identity or expression, source of lawful income used for rental or mortgage payments or any other classification protected by federal, state, or local law will not be tolerated. Anyone found to be engaging in unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

The policy further defines harassment as "written, verbal or physical conduct—including but not limited to slurs, remarks, epithets, jokes, intimidating or hostile acts based on an employee's membership in a protected class, when such conduct has the purpose or effect" of interfering with an employee's work performance, creating a "hostile[] or offensive work environment[,]" or "[o]therwise adversely affecting an individual's employment opportunities."

Following the presentation of the evidence, the ALJ issued a written decision and recommendation. The ALJ found that although there was a factual dispute as to whether Bermudez used the word "nigger" or "nigga," Bermudez's admitted use of the "N" word, regardless of its form, was not intended as a term of endearment, "has no place in [a] public work place" and violated the County's harassment policy. The ALJ rejected the efforts to "minimize the significance of the incident," explaining that the "N" word "has been used for generations to degrade," and is "so vile that [its use] cannot be countenanced."

A-0590-17T1

The ALJ also found Bermudez's "question to Glenn about whether he had taken his hormone, and statement about Glenn's estrogen level clearly amount[ed] to slurs against Glenn's sex and gender identity." Additionally, the ALJ found Bermudez's "use of the terms 'bitch' and 'ass' constitute[d] epithets within the meaning of" the County's harassment policy and constituted "sexually derogatory language [that] was unacceptable in the public work place." The ALJ noted that because Bermudez was a "high ranking union official," his conduct "created an intimidating environment." The ALJ therefore sustained the charge.

The ALJ reviewed Bermudez's suspension in light of his conduct and prior disciplinary history. The ALJ noted Bermudez's "disciplinary record is lengthy, but remarkably minimal," and found Bermudez had not been subject to disciplinary action since 2002, when he received a thirty-day suspension for leaving his post. The ALJ found Bermudez's conduct was sufficiently severe to support the ten-day suspension imposed by the CCDOC. The ALJ explained that Bermudez's use of the "'N' word in any form was unacceptable in the work place" and that its use "in the work place will not be tolerated."

A-0590-17T1

Bermudez filed exceptions to the Commission. On August 22, 2017, the Commission issued its final agency decision adopting the ALJ's findings and recommendation for imposition of the ten-day suspension.

## II.

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). A reviewing court will presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014). Thus, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "Where . . . the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 174, 189 (1980).

A-0590-17T1

This same deferential standard applies to our review of the agency's choice of a disciplinary sanction. In re Herrmann, 192 N.J. 19, 28 (2007). We review discipline only to determine whether the "punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" In re Carter, 191 N.J. 474, 484 (2007) (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

Bermudez contends that his use of the term "nigga" under the circumstances does not rise to the level of conduct constituting harassment or a hostile work environment under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -42. He ignores our Supreme Court has explained that "[r]acial epithets are regarded as especially egregious and capable of engendering a severe impact," Taylor v. Metzger, 152 N.J. 490, 5-2 (1998), and that a supervisor's single use of the term "jungle bunny" to refer to an African American employee conveyed "an unambiguously demeaning racial message that a rational factfinder could conclude was sufficiently severe to contribute materially to the creation of a hostile work environment," id. at 502. We

10

therefore reject the premise underlying defendant's contention—that use of the term "nigga" in the workplace directed in anger against an African-American employee does not constitute harassment or create a hostile environment under the NJLAD—but need not further address its merits because the CCDOC imposed the suspension for Bermudez's violation of the County's harassment policy, not the NJLAD. Bermudez does not dispute that his statements—both those that were racially and sexually abhorrent and derogatory—violated the policy, and any claims Bermudez's conduct did not violate the policy or support the imposition of a disciplinary sanction are without sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

We are also not persuaded by Bermudez's argument that the ten-day suspension is excessive because it is "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness," Carter, 191 N.J. at 484 (quoting Polk, 90 N.J. at 578), and otherwise violated principles of progressive discipline. There is no requirement that progressive discipline be imposed in every case. Herrmann, 192 N.J. at 33. Progressive discipline is inapplicable "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the

11

public interest." Ibid. Here, the evidence supports the Commission's finding that Bermudez's statements were so unacceptable, vile and contrary to the harassment policy that a suspension was appropriate even though his last disciplinary infraction, which resulted in a thirty-day suspension, occurred many years before. In addition, the ten-day suspension does not "shock[] . . . [our] sense of fairness," In re Stallworth, 208 N.J. 182, 195 (2011) (quoting Carter, 191 N.J. at 484), and we find no basis warranting reversal of the Commission's decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION